# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JAMES SWINNEY, *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 1:20-cv-2316 (ACR) |
| ISLAMIC REPUBLIC OF IRAN, *et al.*, | |
| *Defendants.* | |

## <u>MEMORANDUM OPINION</u>

Between 2003 and 2015, the Islamic Republic of Iran sponsored numerous terrorist attacks targeting American servicemembers in the Republic of Iraq.  Four hundred twelve victims of these attacks and their family members (Plaintiffs) have sued Iran and its instrumentalities (Defendants) under the state-sponsored terrorism exception to the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1605A, seeking compensatory and punitive damages.

Defendants defaulted.  The Court then held a two-day evidentiary hearing to determine whether to enter default judgment.  Plaintiffs' evidence focused on the claims of seven "Bellwether Plaintiffs," each of whom was either injured in a terrorist attack or is the family member of a terrorist attack victim.  After the hearing, the Court **GRANTED** the Bellwether Plaintiffs' Motion for Default Judgment, Dkt. 40, and announced that an opinion would follow. Dkt. Notice (Nov. 4, 2024).  This is that Opinion.

* * * * *

The Court heard testimony in this case from and about seven extraordinary soldiers. One cannot overstate the impact of that testimony. Years later, the pride of service and the pain of devastating injuries remains raw. Testifying in open court is never easy. It is many times more difficult when testifying about one's most painful and emotional experiences. Yet each Bellwether Plaintiff did just that. The Court thanks those who testified for giving such heart-rendering and poignant voice to the sacrifice our servicemembers and their family members make every day. Our democracy cannot function without that sacrifice. Thank you.

## I. PROCEDUERAL BACKGROUND

Plaintiffs bring this action pursuant to 28 U.S.C. § 1605A, seeking to hold Iran and its instrumentalities civilly liable for the injuries and deaths of 412 American servicemembers.

### A. Case Management Plan and Evidentiary Hearing

Plaintiffs filed their initial Complaint on August 21, 2020, Dkt. 1, and an Amended Complaint on April 22, 2021, Dkt. 8. Of the six named entity Defendants, Plaintiffs properly effected service on three: the Islamic Republic of Iran, the Islamic Revolutionary Guard Corps, and the Iranian Ministry of Intelligence and Security, in accordance with Section 1608(a)(4) of the FSIA.[1] Dkt. 27. Defendants did not respond or make an appearance within 60 days as required by Section 1608(d) of the FSIA.[2] At Plaintiffs' request, the Clerk of the Court entered default on July 21, 2023. Dkt. 29.

---

[1] Plaintiffs failed to serve Defendants Bank Markazi Jomhouri Islami Iran, Bank Melli Iran, and National Iranian Oil Company. Accordingly, the Court **DISMISSES** the claims against those Defendants without prejudice. *See* Fed. R. Civ. P. 4(m). All references to "Defendants" in this Opinion therefore refer to the Islamic Republic of Iran, the Islamic Revolutionary Guard Corps, and the Iranian Ministry of Intelligence and Security only.

[2] Because Defendants failed to appear, they did not invoke the statute of limitations under the FSIA's terrorism exception. *See* 28 U.S.C. § 1605(b). That defense is therefore waived, and the Court may not raise it sua sponte. *See Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1115 (D.C. Cir. 2019).

Later, the Court adopted Plaintiffs' proposed multiphase case management plan. Dkt. 30; Min. Ord. (Sept. 21, 2023). To wit, Plaintiffs would present evidence related to seven representative attacks, with one Bellwether Plaintiff designated for each attack. Dkt. 43, *see infra* Part III.C. The Court would then issue findings of fact and conclusions of law as to liability and damages for those seven Bellwether Plaintiffs. The Court appointed a Special Master both to provide a recommendation on damages for the Bellwether Plaintiffs and to make formal liability and damages determinations for the remaining Plaintiffs. *See* Dkt. 58.

The Court held a two-day evidentiary hearing on July 23 and 25, 2024, during which Plaintiffs presented evidence establishing Iran's liability for each of the seven Bellwether attacks. Dkts. 50, 52 (Hearing Transcripts). Plaintiffs called seven fact witnesses—the Bellwether Plaintiffs themselves—who testified to the horrific nature of the attacks and their enduring effects. Plaintiffs also called two expert witnesses, Michael Pregent and Dr. Andrew Del Gaudio, who testified about Iran's role in the region and material support to each Bellwether attack. Following the evidentiary hearing, the Court admitted 37 exhibits, including reports from each of the expert witnesses, military service records, and sealed medical records. Dkt. 51.

### B. Expert Qualifications

The Court has qualified Michael Pregent as an expert "in the field of military intelligence, terrorism[,] and counterinsurgency." Tr. (July 23, 2024) at 75. Mr. Pregent is a Senior Fellow at the Hudson Institute and a senior Middle East Analyst and a Visiting Fellow at the Institute for National Strategic Studies at National Defense University. Dkt. 46-1 at 2. He is a former intelligence officer with over 30 years' experience in security, terrorism, counterinsurgency, and policy issues in the Middle East, North Africa, and Southwest Asia. *Id.* In 2018, Mr. Pregent testified before the U.S. House Committee on Foreign Affairs on

"Countering Iranian Proxies in Iraq." *Id.* (cleaned up).  His methodology entailed reviewing witness statements, contemporaneous and subsequent news articles, press briefings, intelligence, and Significant Activity Reports concerning each attack.  *Id.* at 9.  In assessing each attack, Mr. Pregent "mapped the location and date of the attack and, using all available information, considered all other attacks similar in time, locations, and [tactics, techniques, and procedures (TTPs)]." *Id.*

The Court has qualified Dr. Andrew Del Gaudio as an expert in "ground combat asymmetrical warfare and battle [TTPs] . . . to include IED and tactical sniper fire." *Id.* at 165. Dr. Del Gaudio is a military historian with a master's degree in operational studies from the School of Advanced War Fighting and Operational Studies at Marine Corps University and a Ph.D. in history from the University of Liverpool.  *Id.* at 143; *see also* Dkt. 46-3 at 28.  He is a retired Marine Corps Lieutenant Colonel with a 26-year career as an enlisted Marine and Infantry Officer.  Dkt. 46-3 at 28.  Dr. Del Gaudio has deployed to Haiti, Iraq, and Afghanistan for six operational combat tours and to most countries in Europe, South America, Africa, Asia, and the Middle East for training and diplomatic tours.  Tr. (July 23, 2024) at 145.  Dr. Del Gaudio's methodology entailed reviewing the general causation opinions filed, including the reports of Mr. Pregent and Shean Phelps, and the facts surrounding each attack.  Dkt. 46-3 at 1–2.

### III.  FINDINGS OF FACT[3]

Plaintiffs claim that Iran, a designated state sponsor of terrorism since 1984,[4] took advantage of the United States' involvement in the 2003 invasion of Iraq to further its own anti-American agenda and expand its regional influence.  *See* Dkt. 40 at 5–8.  Specifically, they contend that Iran sought to drive out U.S. forces and gain de facto control of the Iraqi government by providing Iraqi terrorist groups who attacked American soldiers with funding, weapons, training, and safe haven.  Tr. (July 23, 2024) at 12–13.

Based on the record of testimonial and documentary evidence presented by Plaintiffs, the Court makes the following findings of fact.

### A.  Iran's Proxy Forces

In 1979, Iran's Supreme Leader, the Ayatollah,[5] established the Islamic Revolutionary Guard Corps (IRGC), a body designed to implement his "vision for an Islamic theocratic government in Iran."  *Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475, 482 (D.D.C. 2021).  The IRGC "is tasked with preserving the Islamic Republic of Iran and at the same time is Iran's main link to its terrorist proxies."  Dkt. 46-1 at 10.

Over time, Iran expanded its regional influence by cultivating combat forces composed of religious extremists, ultimately creating "a fully functional militia backed by the Islamic

---

[3] In making its findings of fact, the Court primarily relies on the expert declarations submitted in this case.  But the Court also takes judicial notice, pursuant to Federal Rule of Evidence 201(b), of similar factual findings by other courts in this District concerning Iran's material support for terrorist attacks in Iraq.  *See, e.g.*, *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 23–25 (D.D.C. 2019); *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 59–64 (D.D.C. 2018); *Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475, 482–84 (D.D.C. 2021); *Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 38–42 (D.D.C. 2019).

[4] 49 Fed. Reg. 2836 (Jan. 23, 1984).

[5] The Ayatollah is the highest-ranking cleric in Iranian Shia Islam, conferred based on religious scholarship, community standing, and spiritual authority.  CIA, *The Politics of Ayatollah Ruhollah Khomeini* 3–4 (1978).  At the time, Ayatollah Ruhollah Khomeini held the position.  *Id.*

Revolutionary Guard Corps-Qods Force" (Qods Force).  *Lee*, 518 F. Supp. 3d at 482 (cleaned up).  The Qods Force—a subdivision of the IRGC—trains and equips terrorist organizations operating outside Iran, including insurgent groups in Iraq.  *See* Dkt. 46-1 at 11.  Reporting directly to the Supreme Leader, the Qods Force executes Iran's extraterritorial agenda and promotes Iranian policy in Iraq.  *Id.* at 10 n.16.

The IRGC has a significant proxy relationship with Hezbollah, a Lebanese terrorist group.  *See id.* at 13.  As relevant here, Hezbollah carried out numerous terrorist attacks to oust U.S. forces from Iraq at Iran's behest.  *See id.* at 14.  Indeed, Iran has trained and financed Hezbollah from its inception in the early 1980s.  *See id.* at 13.  Though based in Lebanon, Hezbollah sees itself as an extension of the Iranian revolution and has sworn an oath of loyalty to Iran's Supreme Leader.  *Id.* at 13–14.  In return, Hezbollah has received "critical assistance" from Iran and the IRGC.  *Lee*, 518 F. Supp. 3d at 482; *see also* Dkt. 46-1 at 13.  This support has been substantial: Iran provides Hezbollah with "as much as $700 million [to] $1 billion per year" in cash, training, intelligence, and weapons.  *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 60 (D.D.C. 2018).

In the early 1990s, Hezbollah began sharing its expertise with other terrorist organizations.  In 1991, senior Al Qaida leader Ayman al-Zawahiri secretly traveled to Iran "to ask for help in [Al Qaida's] campaign to overthrow the government of Egypt."  Dkt. 46-1 at 21 (cleaned up).  While there, al-Zawahiri met with Imad Mughniyah, Hezbollah's terrorist operations chief.  *Id.*  Mughniyah, acting as Iran's agent, had long operated out of Iran while orchestrating high-profile attacks around the world.  *Id.*  During their meetings, Mughniyah "convinced [Al Qaida] of the power of suicide bombing."  *Id.*  This marked a turning point: Al

Qaida, which had previously rejected suicide as religiously impermissible, came to embrace it as a legitimate tactic of jihad. *Id.*; *see also* Tr. (July 23, 2024) at 20–141.

The collaboration deepened in 1993, when Osama bin Laden and other senior Al Qaida operatives met with Mughniyah and Iranian officials "to work on details of a terrorism alliance." Dkt. 46-1 at 21. After the meeting, bin Laden "sent more terrorist operatives to Hezbollah training camps operated by Mughniyah and the IRGC in Lebanon and Iran." *Id.* At these camps, Hezbollah instructors trained Al Qaida operatives and other jihadist fighters in intelligence gathering, operational security, and the construction of explosive devices. *See id.* These programs continued throughout the 1990s, with Mughniyah coordinating closely with Iranian officials and the IRGC-QF. *Id.* The instruction focused on building stronger IEDs and shape charges. *Id.* at 22. Notably, Iran's Supreme Leader was aware of and approved this Iran-Hezbollah terrorist training program. *Id.*

Beyond Lebanon, the Qods Force expanded its reach by training, equipping, and financing Shia[6] militias across Iraq and the broader Middle East—both directly and through Hezbollah. *Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 39 (D.D.C. 2019); *see generally* Dkt. 46-1 at 14–34. According to the U.S. Treasury, the Qods Force has supported various militant groups, including the Taliban, Hamas, Hezbollah, and Iraqi Shia militias. *Fritz*, 320 F. Supp. 3d at 59; *see also* Dkt. 46-1 at 11, 25. By acting through these proxies, Iran furthered its regional objectives while seeking deniability. *Fritz*, 320 F. Supp. 3d at 59. Reflecting this conduct, the U.S. State Department designated Iran as a state sponsor of terrorism

---

[6] Shias and Sunnis are the two main branches of Islam, with Sunnis comprising the majority of Muslims worldwide. *The Sunni-Shia Divide*, Council on Foreign Rels., (Apr. 27, 2023), https://www.cfr.org/article/sunni-shia-divide. This sectarian divide has fueled numerous conflicts across the Middle East. *Id.*

in October 1997, and the U.S. Treasury labeled the IRGC's Qods Force as a supporter of terrorism. *Id.*

### B. Iran's Influence in Iraq

In March 2003, a coalition led by the United States invaded Iraq as part of Operation Iraqi Freedom. Dkt. 46-3 at 6. The stated goal was to remove Saddan Hussein from power so as to dismantle Iraq's efforts to build weapons. *See id.* at 5–6. The invasion led to unintended, and costly, consequences.

Some background is necessary to understand them. At the time, Iraq's population was majority Shia Muslim, but the Sunni minority controlled the government.[7] Iran's Shia-led government often acted as an "agitator" by supporting Shia militia movements to attack the Sunni-dominated government in Iraq.[8] Operation Iraqi Freedom provided Iran with an opening it had long sought. *See id.* at 4, 8. During the invasion, with Hussein distracted, Iran supplied Iraqi factions with weapons, funding, and training. *See id.* at 7–8. And then, because the United States successfully deposed Hussein, Iran could accomplish its goal: shaping a Shia-dominated government in Baghdad. *See id.*

There is, tragically for the Plaintiffs, more. Iran also sought "to push the United States out of the Gulf region," including its military presence in Iraq. *Fritz*, 320 F. Supp. 3d at 61. Iranian leadership believed that humiliating the United States and forcing a withdrawal from Iraq would deter future American interventions in the Gulf. *Id.* Unable to confront the U.S. militarily in a direct conflict, Iran pursued a "strategy of erosion" over long periods of time, empowering

---

[7] *Id.*

[8] *Id.*

8

insurgent groups to carry out bombings, assassinations, and kidnappings on U.S. troops.  Dkt. 46-3 at 4, 8.

### 1.  Aiding Sunni and Shia Militant Groups

Iran's proxy campaign in Iraq was multi-pronged.  In March 2003, the Qods Force released detained Sunni jihadists—including fighters aligned with Abu Musab al-Zarqawi— effectively "unleashing them against the [United States]."[9]  Dkt. 46-1 at 22.  Following their release, the Qods Force "provided al-Zarqawi and his fighters funds and weapons and facilitated al-Zarqawi's entry into the bordering Iraqi Kurdistan and onto Baghdad to attack U.S. forces." *Id.* at 23.  Al-Zarqawi emerged as Al Qaida's "man on the ground," recruiting both former regime loyalists and foreign jihadists entering Iraq through Syria.  *See id.*

At the same time, Iran cultivated several Shia proxy groups with a presence in Iraq.  It backed the Office of the Martyr Sadr, the political apparatus of the radical militia leader, Muqtada al-Sadr.  *See* Dkt. 46-1 at 17, 27.  In 2003, al-Sadr formed Jaysh al-Mahdi (JAM), a "virulently anti-American" militia.  *Id.* at 17 (cleaned up).  Iran supplied JAM with "financial support and weapons," while the Qods Force and Hezbollah trained JAM members for combat. *Id.*  Later in 2006, al-Sadr splintered JAM into semi-autonomous factions to address its varied objectives, forming "Special Groups" specifically tasked with targeting U.S. and coalition forces. *Id.* at 26.  These Special Groups became some of the most capable and "ideologically

---

[9] Following the U.S. military invasion of Afghanistan in 2001, Iran captured Sunni jihadist groups—including Al Qaida—who had fled Afghanistan, viewing them as a threat to Shia rule in Iran.  Karim Sadjadpour, *The Sinister Genius of Qassem Soleimani*, Wall St. J. (Jan. 10, 2020), https://www.wsj.com/articles/the-sinister-genius-of-qassem-soleimani-11578681560.  After Operation Iraqi Freedom, the Iranian government sought to disrupt the U.S. offensive by any means necessary, including permitting Sunni militant groups to operate in Iraq.  *Id.*

committed" Shia militant groups, receiving advanced training and weaponry from the Qods

Force and Hezbollah. *Id.* at 26–27.

In mid-2006, seeking greater operational control, Iran recruited Qais Khazali to lead a

new Special Group: Asayb al-Haq (AAH). *See* Dkt. 46-1 at 14–15. Iran's Supreme Leader, Ali

Khamenei, personally "met with [Khazali in Iran] and recruited him to lead [AAH]," instructing

that it "operate without the knowledge or authorization of [Muqtada al-Sadr]." *Id.* AAH thus

operated as an Iranian proxy in Iraq, carrying out the IRGC's agenda and advancing its interests.

*See id.* at 14–16.

The Qods Force supplied JAM and AAH "with Iranian-produced advanced rockets,

sniper rifles, automatic weapons, [and] mortars," all of which "have killed thousands of

[c]oalition and Iraqi [f]orces." *Fritz*, 320 F. Supp. 3d at 63. Among the most lethal tools

supplied were explosively formed penetrators (EFPs) specially designed as armor-piercing

weapons to be used against coalition forces. *Id.*; *see also* Dkt. 46-1 at 16. Iran smuggled these

weapons into Iraq through "ratlines," primarily for AAH's use. *Fritz*, 320 F. Supp. 3d at 63. On

the Iraqi side, Khazali smuggled arms and artillery from Iran into Iraq. *Id.* (cleaned up).

Khazali's brother, Laith, "was instrumental in acquiring surface-to-air missiles (SAMs), RPGs,

bazookas, and Stella missiles for [S]pecial [G]roups." *Id.* (cleaned up).

## 2. Hezbollah's Assistance and Aid

Hezbollah also played a central role in Iran's campaign. In mid-2005, senior Hezbollah

commander Ali Musa Daqduq traveled to Iraq to assist the Qods Force in training and organizing

Special Groups. Dkt. 46-1 at 16. Daqduq "made trips in and out of Iraq and reported on the

training and arming of AAH operatives in mortars and rockets . . . and kidnapping operations."

*Id.*

Hezbollah's assistance ensured that Iran's proxies were trained to a high level of sophistication. Dkt. 46-1 at 27. Its training programs covered both basic and advanced paramilitary skills and weapons courses, including instruction on mortars, IEDs, firearms, tactics, logistics and support, and information operations. *Id.* at 28. Hezbollah even provided "train-the-trainer" programs, enabling proxy groups to prepare new fighters, thus expanding Iran's reach and the lethality of its proxies. *Id.* By 2007, these Special Groups accounted for nearly half of all attacks on Coalition Forces, with Iran "providing between $750,000 and $3 million worth of equipment and funding to Special Groups every month." *Id.* at 28–29.

### 3. Aiding Kata'ib Hezbollah

In 2007, Iran helped "form[], man[], equip[], train[], and fund" another powerful militia in Iraq: Kata'ib Hezbollah (KH). *Id.* at 17–18. Unlike Hezbollah, which originated in Lebanon, KH originated and operated in Iraq. *Id.* at 13. KH quickly emerged as one of the most dangerous and sophisticated militant groups operating in Iraq, orchestrating numerous attacks on U.S. forces. *Id.* at 18. The U.S. State Department designated KH as a foreign terrorist organization in June 2009. *Id.* at 19.

Iran's support included moving KH operatives into Iran for training and smuggling weapons across the border into Iraq. *See Lee*, 518 F. Supp. 3d at 483. A key element of this campaign was Iran's development and deployment of EFP attacks: "one of Iran's primary forms of material support to the Special Groups was financing, manufacturing, and deploying EFPs." *Id.*; *see also* Dkt. 46-1 at 18. These weapons, "professionally manufactured and specifically designed to target U.S. and Coalition Forces' armor," were funneled to Special Groups in Iraq to target armored patrols and supply convoys. Dkt. 46-1 at 15 n.30.

### 4.  American Intelligence

American intelligence identified Iran's handiwork and influence on Iraqi militant groups. In 2007, the U.S. Treasury determined that the Qods Force "provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi [Shia] militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians." *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 24 (D.D.C. 2019); Dkt. 46-1 at 10.  In 2011, the U.S. State Department concluded that Iran bore responsibility for the increase in lethal attacks on U.S. forces in Iraq and had equipped militants with the capacity to assemble explosives specifically designed to defeat armored vehicles.  *Karcher*, 396 F. Supp. 3d at 24.

### C.  Iran Materially Supported Each Bellwether Attack

#### 1.  Bellwether Plaintiff 1: The Family of Lance Corporal Jonathan Spears

Lance Corporal Jonathan Spears, a U.S. citizen, served in the U.S. Marine Corps.  Dkt. 53 at 11.  Raised in Molino, Florida, his father, Timothy Spears, described him as a "rambunctious little boy" who grew up to be the kind of person who "would give you the shirt off his back."  Tr. (July 23, 2024) at 194, 201.  Mr. Spears recalled, with understandable pride, that when his son worked at a Subway store, he would make sandwiches for the homeless people nearby and pay for them himself.  *Id.* at 201.  "That was just the kind of kid he was.  I mean, nobody told him to do it, he just thought it was the right thing to do."  *Id.*  Lance Corporal Spears loved playing football, eventually earning a scholarship to play at the University of Buffalo.  *Id.* at 194–95.

Deeply affected by the events of September 11th, Lance Corporal Spears set his sights on joining the Marine Corps.  *Id.* at 195.  On his first visit to the recruiting office, the staff sergeant told him that at his football playing weight of 300 pounds, he was too heavy for the Marine

Corps.  *Id.*  Undeterred, Lance Corporal Spears spent the next year doing "nothing but eat[ing] yogurt three times a day" and running "five miles every day" until he met the Marine Corps' weight requirement.  *Id.* at 196.  He checked back in with the same staff sergeant, went to Parris Island, and graduated—becoming a rifleman in the infantry.  *Id.*  Throughout his service in the Marine Corps, Lance Corporal Spears deployed to Iraq twice, with his second deployment being to Ramadi in September 2005.  *Id.* at 196–97.  On October 23, 2005, while he patrolled on a rooftop in Ramadi, a sniper round to the head killed him instantly.  Dkt. 53 at 11.

Lance Corporal Spears' passing had devastating consequences for his survivors.  His mother Marie relapsed on an addiction to narcotics that she had successfully beaten after back surgery.  Tr. (July 23, 2024) at 199.  In July 2008, notwithstanding her family's repeated attempts to get her the medical help she needed, Marie tragically took her own life at her son's grave site.  *Id.*  And his sisters have suffered depression, panic attacks, and anxiety.  *Id.* at 200.  Mr. Spears, who has raised his two daughters alone since Marie's passing, acknowledged that he too struggles with depression over his son's death, even twenty year later.  *Id.* at 201.

Plaintiffs' experts, Mr. Pregent and Dr. Del Gaudio, each testified about Iran's role in the Ramadi region at the time of the October 23, 2005 Bellwether attack on Lance Corporal Spears.  *See id.* at 100–107; 169–179.  Mr. Pregent attributed the attack to Al Qaida, which, he explained, received "lethal aid and support from Iran," as well as "extra manning capability" from a "foreign fighter facilitation network" also backed by Iran.  *Id.* at 103–04.  He identified the sniper who killed Lance Corporal Spears as a foreign fighter brought to Iraq by this Iran-supported network and opined that Iran's material support and resources were a substantial factor enabling the attack.  *Id.* at 104, 106–07.  Dr. Del Gaudio added to Mr. Pregent's opinions,

emphasizing that the attack could not have occurred without the "highly trained sniper and high caliber weapons" of the kind that foreign fighters would have brought in. *Id.* at 169–70.

### 2. Bellwether Plaintiff 2: The Family of Sergeant Daniel Varnado

Sergeant Daniel Varnado, a U.S. citizen, served in the U.S. Army National Guard. Dkt. 53 at 12. An avid baseball player, Sergeant Varnado pitched for two years at his community college before signing with the University of West Alabama to continue his baseball career. Tr. (July 25, 2024) at 59. He and his wife, Sharon Shavers, named their son Kannon—with a "K," like a strikeout on a scorecard—a tribute to Sergeant Varnado's love of the game. *Id.* at 58. Ms. Shavers, with obvious pride, testified that she sees much of Sergeant Varnado in their son Kannon: "they're funny," she said, "and they both have very great team leadership skills." *Id.* at 68. She expressed delight in these similarities, saying she's proud to see those qualities live on in their son. *Id.*

In 2000, Sergeant Varnado enlisted in the Mississippi National Guard to serve his country and earn money for college. *Id.* at 60. Before a deployment to Iraq in 2005, he and his wife postponed a planned move to Alabama, deciding to wait until he returned. *Id.* at 59, 62. In February 2005, Sergeant Varnado deployed to Iraq, where he served as a gunner. *Id.* On May 23, 2005, during a mounted patrol in Haswa, Iraq, his vehicle ran over an IED, killing him and three others. Dkt. 53 at 12.

Ms. Shavers testified to the profound impact of her husband's passing on her and their son, Kannon, who was just 20 months old at the time. Tr. (July 25, 2024) at 64. On the day he died, Ms. Shavers had planned to speak with her husband during her lunch break, but the conversation never happened. *Id.* at 62. That evening, she was at home watching TV with a friend when she "heard a knock on the door," and what followed felt, in her words, "like scenes

14

out of a movie." *Id.* at 62–63.  Although she "didn't think the worst thing" at first, she was told

that Sergeant Varnado was "not here anymore." *Id.* at 63.

Ms. Shavers described the period after Sergeant Varnado's death as "just survival mode

for a long time." *Id.* at 67.  Less than two months after his death, Hurricane Katrina hit the area,

compounding her hardship.  *Id.* at 64–65.  Displaced from her home, Ms. Shavers was forced to

rely on friends for shelter and struggled to access necessities like groceries and diapers.  *Id.* at

64–65.  The strain forced Ms. Shavers to become, in her words, an "expert compartmentalizer,"

preventing her from fully processing her husband's death. *Id.* at 65.  Years of operating in

"survival mode" have led to lasting memory issues, and Ms. Shavers has sought psychiatric

treatment to help her retain and process the events surrounding Sergeant Varnado's passing. *Id.*

at 67.  Participating in this lawsuit, she testified, helped her realize that her husband and his

fellow soldiers "aren't forgotten." *Id.* at 70–71.

Mr. Pregent and Dr. Del Gaudio each testified about Iran's role in the May 23, 2005

Bellwether attack in Haswa that killed Sergeant Varnado.  *See* Tr. (July 23, 2024) at 108–114;

179–181.  Mr. Pregent described the attack as an "improvised explosive device ambush"

executed after Al Qaida "had established an intelligence picture of what U.S. patrols were

doing," including their "patterns of travel." *Id.* at 110–11.  Al Qaida, he explained, "knew what

time to put the IED in place." *Id.*   He attributed the attack to Al Qaida in Iraq, emphasizing that

the group's operational capability was bolstered by Iran's "material support and resources"—

support that included the procurement of the IED itself. *Id.* at 111–14.  Dr. Del Gaudio

corroborated this assessment, opining that "there was no way that this attack could have been

carried out without the ability of another echelon to teach them how to do that." *Id.* at 181.

### 3.  Bellwether Plaintiff 3: SPC Lance A. Gieselmann

SPC Lance A. Gieselmann, a U.S. citizen, served in the U.S. Army.  Dkt. 53 at 13.  A native of Chester, Illinois, he was the captain of his high school football team.  Tr. (July 25, 2024) at 74.  He later married his wife, Ashley, and together they have seven children.  *Id.* at 75.

Inspired by his uncle's service and a deep desire to serve his country, SPC Gieselmann joined the Army in May 1999.  *Id.*  In the spring of 2003, SPC Gieselmann deployed to Iraq, where he served as an armored crewman on a tank.  *Id.* at 76.  On October 28, 2003, he and two other men—Sergeant Mike Barrera and Specialist Isaac Campboy—guarded a water-pumping station in Balad, Iraq.  *Id.* at 77.  After spending the day repairing a tank, they borrowed another to retrieve a needed tool.  *Id.* at 78–79.  As they returned, their borrowed tank ran over an IED.  *Id.* at 82.  The explosion killed Specialist Campboy and Sergeant Barrera.  *Id.* at 85, 91.  It very nearly killed SPC Gieselmann.  *Id.*

SPC Gieselmann testified to his extensive injuries, the immediate aftermath of the attack, and the lasting effects it has had on him and his family.  His heart stopped four times en route from Iraq to Germany, and doctors did not expect him to survive.  *Id.* at 95.  Doctors in Germany put him in a medically induced coma for three and a half weeks.  *Id.* at 62.  They amputated his left leg above the knee, rebuilt his L1 vertebra because it was "pulverized," and removed shrapnel that had entered his left thigh and his chest.  *Id.* at 93–95.  SPC Gieselman remained in the hospital for over a year.  *Id.* at 92.  He received a Purple Heart for his service.  *Id.*

More than two decades later, SPC Gieselmann remains "in pain every day."  *Id.* at 96.  He has trouble breathing out of his nose and uses a wheelchair after his leg weakness made prosthetic use nearly impossible.  *Id.* at 96–97.  His abdominal scars cause painful muscle cramps whenever he moves a certain way, and because doctors had to reconstruct his face, he

16

can no longer smile. *Id.* at 96. He cannot work because after a short time, "the pain kicks in and [he has] to sit down or lay down." *Id.* at 97. SPC Gieselmann described the emotional toll on his family, particularly his eldest child, who remembered him before the attack and hesitated to sit with him because he was "so banged up." *Id.* at 96–97.

SPC Gieselmann struggles with survivor's guilt. He often asks why he survived while his friends and fellow servicemembers did not. *Id.* at 98. He remains in contact with his fellow servicemembers' families and remembers the men with deep affection. *Id.* at 97. He described Specialist Campboy as an "extremely hard worker" and someone who, "if you needed help, he was the first one to jump in to help without question." *Id.* at 99. He recalled Sergeant Barrera as a karaoke lover and a close friend with whom he loved playing football. *Id.* at 99–101. Despite everything he has endured, SPC Gieselmann remains proud of his service—and rightfully so. *Id.* at 98.

Mr. Pregent and Dr. Del Gaudio each testified about Iran's role in the October 28, 2003 Bellwether attack in Balad that injured SPC Gieselmann and killed Specialist Campboy and Sergeant Barrera. *See* Tr. (July 23, 2024) at 117–121; 181–84. Citing the size and sophistication of the IED—which required being "[dug] into the ground" and "[put] in place at night"—Mr. Pregent attributed the attack to Al Qaida in Iraq. *Id.* at 118–20. He characterized it as a "signature" Al Qaida operation, carried out in an area where the group was "trying to establish primacy." *Id.* at 118–19. Mr. Pregent testified that Iran played a critical enabling role by providing weapons components and explosive expertise—support that made the attack "more lethal." *Id.* at 120–21. Dr. Del Gaudio corroborated this assessment, emphasizing the IED's advanced design and describing the "violent concussive nature of that explosion" as "tremendous." *Id.* at 182.

### 4. Bellwether Plaintiff 4: Sergeant Richard S. Ford

Sergeant Richard S. Ford, a U.S. citizen, served in the U.S. Army National Guard. Dkt. 53 at 14. Drawn by the "meaning and purpose" military service offered, he joined the Army National Guard in 1986. Tr. (July 25, 2024) at 107, 124. Sergeant Ford loved "everything" about his role and remained in it for 26 years. *Id.* at 125.

In August 2004, he was called to active duty and deployed to Iraq in December. *Id.* at 108. On February 3, 2005, Sergeant Ford, Sergeant First Class John Cooley, Specialist Jack Walker, and Doc Smith conducted a counter-mortar patrol through Dogwood, Iraq, in a Hummer accompanied by two tanks. *Id.* at 109, 111–114, 129. During the patrol, Sergeant Ford's team triggered an IED. *Id.* The explosion killed Sergeant First Class Cooley, who had been "a really good friend" of Sergeant Ford's since elementary school and hoped to become a nurse after his deployment. *Id.* at 114, 129. The explosion seriously injured Sergeant Ford. *Id.* at 111–13. He received a Purple Heart for his service. *Id.* at 117.

Sergeant Ford testified to his injuries and the impact they have had on his life and career. He has undergone a left knee replacement, suffers damage to his right knee, and experiences worsening presynaptic Parkinsonian syndrome. *Id.* at 118. He also endures migraine headaches caused by traumatic brain injury and memory loss. *Id.* Emotionally, Sergeant Ford struggles with post-traumatic stress disorder (PTSD), sleeping no more than four hours a night since the attack. *Id.* at 120. He testified that the PTSD severely strained his relationship with his wife until he began treatment. *Id.* at 121. After the explosion, he said he "didn't know who [he] was" anymore and described the attack as having "ruined [his] life." *Id.* at 120–22. He remained in Iraq after the attack, explaining, "I couldn't leave my guys." *Id.* at 126. He then served six more years in the Army National Guard and continues to "live and breathe" his oath to his day. *Id.* at

127.  Despite the trauma, Sergeant Ford shared that each day, he tries to "put one foot in front of the other and try to help as many people" as he can.  *Id.* at 120, 122.  He expressed pride—as he should—in helping "get the word out" by participating in this lawsuit.  *Id.* at 128.

Mr. Pregent and Dr. Del Gaudio each testified about Iran's role in the February 3, 2005 Bellwether attack in Dogwood that killed Sergeant First Class Cooley and injured Sergeant Ford. Tr. (July 23, 2024) at 125–128; 187–188.  Mr. Pregent testified that the attack occurred in an Al Qaida stronghold—the most dangerous province in Iraq—fueled by a steady "foreign fighter flow" and concealed "weapons caches."  *Id.* at 125–26.  He explained that this province was an "area where Iran wanted Al Qaida to have a permissive environment" to facilitate attacks against U.S. forces.  *Id.* at 127.  He further identified the IED's construction as the work of explosive experts linked to an Iran-backed "foreign fighter network."  *Id.*  In his view, Iran's material support was a substantial factor in enabling the attack.  *Id.*  Dr. Del Gaudio agreed, testifying that the IED attack required "a heightened level of skill, [and] training" that, in his assessment, could ultimately be traced to Iranian involvement.  *Id.* at 188.

### 5.  Bellwether Plaintiff 5: Private Timothy J. Pope Jr.

Private Timothy J. Pope, Jr., a U.S. citizen, served in the U.S. Army.  Dkt. 53 at 14.  A native of Norfolk, Virginia, he enlisted in January 2004 and served as an Abrams tank crewman. Tr. (July 25, 2024) at 131, 133.  Private Pope deployed to Iraq in February 2005.  *Id.* at 134.

Just weeks later, on February 24, 2005, an IED detonated directly beneath Private Pope's seat while he drove the lead tank in a route clearance operation through Samarra, Iraq.  *Id.* at 134, 136, 138.  During the blast, he saw a "huge cloud of white smoke" and found himself amid "a lot of commotion, a lot of yelling."  *Id.* at 138.  The tank, he recalled, "was continuously rolling," and "everything inside imploded on me."  *Id.* at 141.  As fellow soldiers pulled Private

Pope out of the hull of the tank and into the turret, he "kept screaming . . . at my legs." *Id.* at

138.  Private Pope sustained serious injuries and received a Purple Heart and a Combat Action

Badge for his service.  *See id.* at 144–50, 152.

Private Pope testified to the physical and emotional toll the attack has taken on his life.

His injuries include trauma to his head, abdomen, left forearm, hip, pelvis, and both legs—

requiring multiple surgeries.  *Id.* at 145–51.  He battled severe infections during recovery and,

after a period of prescribed use, developed an addiction to opioids and narcotics.  *Id.* at 151.  He

has since joined Narcotics Anonymous and testified that he is "100 percent" clean today.  *Id.*

The emotional consequences were equally devastating.  Private Pope had planned to

serve in the Army for "at least a minimum of 20 years," and envisioned that career as a stable

future for his newborn son.  *Id.* at 154.  Instead, after his discharge, he began working as a

chef—where he began drinking more "and not coming home when I was supposed to after my

shift."  *Id.* at 153–54.  His marriage to his wife, TJ, ended, and he became estranged from his

parents and siblings for nine years.  *Id.* at 154, 156–57.  Today, Private Pope reports that his

relationships with TJ and his parents are "great," and he finds meaning in rebuilding his life—

especially in the joy of working on his home.  *Id.* at 154–56.

Mr. Pregent and Dr. Del Gaudio each testified about Iran's role in the February 24, 2005

Bellwether attack in Samarra that injured Private Pope.  *See* Tr. (July 23, 2024) at 128–131; 188–

91.  Mr. Pregent explained that the attack occurred in a region where Al Qaida had "established

primacy," bolstered by an influx of foreign fighters.  *Id.* at 128.  He described the attack as a

"complex" operation, in which Al Qaida relied on detailed intelligence on U.S. patrol patterns to

maximize casualties.  *Id.* at 129.  The IED strike that wounded Private Pope, he noted, was part

of the same coordinated action that killed another soldier, Staff Sergeant Gresham, just 44

minutes later. *Id.* Mr. Pregent testified that Iran provided the explosive experts and training that enabled Al Qaida to carry out these attacks—making them more lethal. *Id.* at 130–31. He opined that Iran's material support was a substantial factor in the attack. *Id.* Dr. Del Gaudio concurred, describing the attack as part of "an emergent TTP" in a "very well-developed engagement area," enabled by Iranian involvement. *Id.* at 189.

### 6. Bellwether Plaintiff 6: Specialist Michael Scott Anderson

Specialist Michael Scott Anderson, a U.S. citizen, served in the U.S. Army. Dkt. 53 at 15. He enlisted in May 2006 and served in field artillery, providing support to units out on missions. Tr. (July 25, 2024) at 164.

In November 2007, Specialist Anderson deployed to the Diyala Province in Iraq. *Id.* at 165. On December 20, while providing artillery support to the 2nd Infantry Division during a supply run, the unit stopped to meet with a local sheik. *Id.* at 166. Specialist Anderson and his battery stood guard during the meeting. *Id.* at 167. As he approached his truck to ask if anyone wanted something from a nearby market, a suicide bomber nearby detonated his vest. *Id.*; Dkt. 53 at 15. The explosion seriously injured Specialist Anderson and killed First Lieutenant Jeremy Ray. Dkt. 53 at 15. Specialist Anderson received a Purple Heart and a Combat Action Badge for his service. Tr. (July 25, 2024) at 173.

Specialist Anderson testified to his injuries and their lasting effects on his life. He suffered shrapnel wounds to his lower extremities, third-degree burns, a concussion, and PTSD. Dkt. 53 at 15. After the attack, Specialist Anderson was airlifted to Germany, then transferred to the United States to recover. Tr. (July 25, 2024) at 172. Though he had the option to remain home, he chose to return to Iraq to support his "buddies [who] were still over there." *Id.* at 173. Upon his return, a drill sergeant approached him, nearly in tears, and "gave me a hug and gave

me a kiss on the cheek." *Id.* at 178-79. Specialist Anderson described it as "a boost of morale from the guys seeing me." *Id.* at 179. He returned home in 2009 but testified that he "felt lost" in the aftermath. *Id.* at 174. Physically, his mobility remains limited. *Id.* at 177. Emotionally, he continues to grapple with the impact of his injuries on his family relationships. *Id.* He currently works as a stay-at-home father. *Id.*

Mr. Pregent and Dr. Del Gaudio each testified about Iran's role in the December 20, 2007 Bellwether attack in the Diyala Province that injured Specialist Anderson and killed First Lieutenant Ray. *See* Tr. (July 23, 2024) at 131–34; 191–92. Mr. Pregent explained that the suicide vest used in the attack was a known Al Qaida tactic, requiring specialized expertise to smuggle and conceal beneath civilian clothing. *Id.* at 132. He noted that such capabilities likely came through the "foreign fighter facilitation network," a system supported by Iran to bring experts into Iraq. *Id.* While Mr. Pregent did not attribute the explosives themselves directly to Iran, he testified that Iran would have been aware of any weapons expert entering Iraq and that Iran's material support made the attack more lethal. *Id.* at 134–35, 141. Dr. Del Gaudio agreed, stating that the attack "required a tremendous level of [] radicalization" and could not have occurred without Iran's facilitation. *Id.* at 191–92.

### 7. Bellwether Plaintiff 7: Lance Corporal Kevin J. Rumley

Lance Corporal Kevin J. Rumley, a U.S. citizen, served in the U.S. Marine Corps. Dkt. 53 at 16. A native of Fairfax, Virginia, he enlisted after high school, inspired by the service of his father, a fellow Marine, and his grandparents. Tr. (July 25, 2024) at 187. After losing his mother at age 16, Lance Corporal Rumley viewed the Marines as a way to "save [his] life." *Id.* at 187–88. He joined in August 2003 as a rifleman and deployed to Husaybah, Iraq, later that year. *Id.* at 188–89.

On April 8, 2004, during a routine foot patrol through the Al Qa'im District, an IED detonated in front of Lance Corporal Rumley's unit. *Id.* at 189–90. As the patrol split into two teams, with Lance Corporal Rumley covering the rear, a second IED—hidden in a wall and triggered by cell phone—exploded. *Id.* at 190, 193. The blast killed his first friend in the Marines, Lance Corporal Christopher Wasser, whom Lance Corporal Rumley remembered as "very kind" and an "amazing Marine." *Id.* at 195. The explosion seriously injured Lance Corporal Rumley. *See* Dkt. 53 at 16. He received a Purple Heart award and a Combat Action Ribbon for his service. Tr. (July 25, 2024) at 196.

Lance Corporal Rumley testified to the profound physical consequences of the attack. He suffered a traumatic brain injury; a broken right femur; third-degree burns; nerve damage in his lower body; and shrapnel wounds to his face, arms, legs, and hands. Dkt. 53 at 16. He also lost partial vision in his left eye. *Id.* Lance Corporal Rumley was evacuated to Germany and then to Walter Reed, where he underwent 32 surgeries over 18 months. Tr. (July 25, 2024) at 195.

The emotional toll was equally profound. When he left the hospital in 2005, Lance Corporal Rumley felt "no sense of purpose" without the Marine Corps. *Id.* at 200. He struggled physically—unable to skateboard or run, activities he once loved—and spiraled into addiction and homelessness. *Id.* at 200–01. He became dependent on heroin and alcohol and testified that he "wanted to die," describing his path as a "short pathway to death." *Id.* at 201. Lance Corporal Rumley described being unprepared "for the psychological effects of being blown up, of losing friends, of being torn from that tribe." *Id.* He shared that, even today, "every relationship [he has] has been formed and shaped by" the attack. *Id.* at 206.

After several arrests and involuntary commitments, and with the help of medical professionals and his older brother, Lance Corporal Rumley began to recover. *Id.* at 201–02. He

has now been clean for 13 years and dedicates his life to helping fellow veterans through a veterans' treatment court.  *Id.* at 202–04.  He describes service to others as "one of the bedrocks of recovery."  *Id.* at 203.

Mr. Pregent and Dr. Del Gaudio each testified about Iran's role in the April 8, 2004 Bellwether attack in the Al Qa'im District that injured Lance Corporal Rumley and killed Lance Corporal Wasser.  Tr. (July 23, 2024) at 121–125; 184–86.  Mr. Pregent explained that the "complex attack" occurred near the Iraq-Syria border—a key transit point for Al Qaida to receive explosive and tactical expertise from Syria.  *See id.* at 121–22, 124.  He noted that the use of back-to-back IEDs demonstrated a high level of weapons proficiency and an "intelligence picture" that allowed attackers to "map out the route the U.S. forces were taking."  *Id.* at 123.  Mr. Pregent opined that Iran's material support made the attack more lethal and was a substantial factor in its execution.  *Id.* at 124.  Dr. Del Gaudio concurred, asserting that "this [was] absolutely a complex attack."  *Id.* at 185.

## II.  LEGAL STANDARD

The FSIA specifies that "[n]o judgment by default shall be entered by a court of the United States . . . against a foreign state . . . unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e).  This standard "leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide."  *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014).  That said, courts are not free to take an "anything goes" approach.  The FSIA gives courts "a duty to scrutinize the plaintiff's allegations, and . . . not unquestioningly accept a complaint's unsupported allegations as true."  *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012).

"[T]he FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, and [u]ncontroverted factual allegations that are supported by admissible evidence are taken as true." *Karcher*, 396 F. Supp. 3d at 21 (cleaned up).  In cases involving terrorism, courts should liberally construe the Federal Rules of Evidence to ensure that state sponsors of terrorism cannot "effectively immunize themselves by killing their victims, intimidating witnesses, and refusing to appear in court." *Han Kim*, 774 F.3d at 1048.  "[I]ndeed, the quantum and quality of evidence that might satisfy a court can be less than that normally required." *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) (cleaned up).

## IV.  CONCLUSIONS OF LAW

The FSIA is "the sole basis for obtaining jurisdiction over a foreign state in [U.S.] courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989).  The Act provides that foreign states ordinarily enjoy sovereign immunity from suits in U.S. courts, *see* 28 U.S.C. § 1604, but also establishes several exceptions to that rule, *see, e.g.*, *id.* §§ 1605–1605B.  The sole relevant exception here is the "state-sponsored terrorism exception," 28 U.S.C. § 1605A, which "creates subject matter jurisdiction and a private cause of action for certain claims against state sponsors of terrorism." *K.E.F.V. v. Islamic Republic of Iran*, 135 F.4th 988, 991 (D.C. Cir. 2025) (citing 28 U.S.C. § 1605A(a), (c)).  Covered claims include "personal injury or death" arising from acts of torture, extrajudicial killing, aircraft sabotage, hostage taking, and the provision of material support.  28 U.S.C. § 1605A(c).

Under the FSIA, a federal district court may exercise personal and subject-matter jurisdiction over a foreign state where specific statutory conditions are met.  *See Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 148 (D.D.C. 2011).  Personal jurisdiction exists if the plaintiff serves the defendant in compliance with 28 U.S.C. § 1608.  *See* 28 U.S.C. § 1330(b).

Subject-matter jurisdiction exists when the defendant's conduct falls within one of the FSIA's exceptions.  *See* 28 U.S.C. § 1330(a), 1604.

Both jurisdictional requirements are satisfied here.  As discussed above, *see supra* Part I.A, Plaintiffs properly served Defendants.  And as explained below, their conduct falls within the FSIA's state-sponsored terrorism exception.  Because the Court has subject-matter jurisdiction, and because the Bellwether Plaintiffs' claims fall squarely within that provision, the Court concludes that the Bellwether Plaintiffs have established a right to relief under the federal cause of action set forth in Section 1605A.  *See, e.g.*, *Est. of Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1, 19 (D.D.C. 2011) ("[L]iability under section 1605A(c) will exist whenever the jurisdictional requirements of section 1605A are met.") (cleaned up).

## A.  Subject-Matter Jurisdiction: "State Sponsor of Terrorism" Exception

Plaintiffs have met the requirements for subject-matter jurisdiction.  Pertinent here is 28 U.S.C. § 1605A, known as the FSIA's "terrorism exception."  *See Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 352 (D.C. Cir. 2018).  Under this exception, jurisdiction exists where (a) the foreign state lacks immunity and (b) this Court meets the statutory requirements to hear their claim.  *See* 28 U.S.C. § 1605A(a)(1), (2).  Plaintiffs have demonstrated both elements.

### 1.  Iran Lacks Immunity

Section 1605A of the FSIA removes sovereign immunity where five conditions are met: (1) the plaintiff seeks money damages; (2) the defendant is a foreign state; (3) the claim arises from personal injury or death; (4) the injury was caused by the defendant; and (5) the cause was "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act."  *Id.* § 1605A(a)(1); *see also Abedini v. Gov't of Islamic Republic of Iran*, 422 F. Supp. 3d 118, 128 (D.D.C. 2019).

26

Plaintiffs have established each of these five requirements.  They (1) seek monetary damages, Dkt. 1 at 464–66, (2) from a foreign state, the Islamic Republic of Iran, *id.* at 34, (3) for injuries and deaths that occurred during the Bellwether attacks, Dkt. 53. at 11–17; *see also* Tr. (July 23, 2024) at 105, 114, 120, 126, 129, 130, 133.

The remaining two elements—causation and qualifying conduct—warrant further discussion.

### a.  Causation

The FSIA requires a showing of proximate cause.  *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004).  To establish proximate cause, Plaintiffs must show that Iran's actions were a "substantial factor" in the sequence of events leading to their injuries, and that the injuries were "reasonably foreseeable or anticipated as a natural consequence" of Iran's actions.  *Frost*, 383 F. Supp. 3d at 48 (cleaned up).

Plaintiffs have made the necessary showing that Iran's material support caused the harms they suffered.  As discussed above, *see supra* Part III.C, Mr. Pregent and Dr. Del Gaudio testified that each attack was carried out by terrorist operatives who received weapons, training, and logistical support through Iranian-backed networks.  Tr. (July 23, 2024) at 103–41; 165–92.  That material support enabled the attacks and was a substantial factor in bringing them about.  *Id.* at 140–41; 192.  The injuries that flowed were not merely foreseeable—they were a direct and intended consequence of Iran's support for anti-Iraq and anti-U.S. insurgents.  *Id.* at 141; 192.

### b.  Extrajudicial Killing

The FSIA adopts the definition of "extrajudicial killing" from the Torture Victim Protection Act of 1991 (TVPA).  28 U.S.C. § 1605A(h)(7).  Under the TVPA, an "extrajudicial killing" is a "deliberated killing not authorized by a previous judgment pronounced by a

regularly constituted court."  Pub. L. No. 102-256, § 3(a), 106 Stat. 73.  A "deliberated" killing "is simply one undertaken with careful consideration, not on a sudden impulse."  *Owens v. Republic of Sudan*, 174 F. Supp. 3d 242, 263 (D.D.C. 2016) (cleaned up).

Each Bellwether attack qualifies.  Mr. Pregent and Dr. Del Gaudio testified that each operation was carefully orchestrated by terrorist actors using intelligence, tactics, and lethal tools made possible by Iranian support.  Tr. (July 23, 2024) at 103–41; 165–92.  None of the killings were carried out under legal authority; all were the work of "terrorist groups in Iraq that were materially supported by Iran."  *Id.* at 8.

This element is satisfied with respect to the Bellwether Plaintiffs who survived the attacks but lost fellow servicemembers.  Courts in this Circuit have made clear that the FSIA's terrorism exception encompasses attempted extrajudicial killings when the attack results in death.  *See, e.g.*, *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 81 (D.D.C. 2017).  Accordingly, Bellwether Plaintiffs Gieselmann, Ford, Pope, Anderson, and Rumley—each of whom survived an attack that killed a fellow servicemember—meet this requirement as well.  *See* Dkt. 51 at 15–19.

In sum, the Bellwether Plaintiffs have established that their claims satisfy all five elements required under the FSIA's terrorism exception.  The Court therefore concludes that Iran is not entitled to sovereign immunity.

### 2.  The Court May Hear Plaintiffs' Claims

Under Section 1605A(a)(2) of the FSIA, Plaintiffs must meet three more criteria to establish jurisdiction.  First, the foreign state involved must have been designated a state sponsor of terrorism at the time the alleged acts occurred and remained so when the claim is filed.  28 U.S.C. § 1605A(a)(2)(A)(i)(I).  Second, the claimant or victim must have been a national of the

United States or a member of the armed forces at the time of the acts.  *Id.* § 1605A(a)(2)(A)(ii).

Third, in cases involving acts in the foreign state against which the claim has been brought, the

claimant must give "the foreign state a reasonable opportunity to arbitrate the claim in

accordance with the accepted international rules of arbitration."  *Id.* § 1605A(a)(2)(A)(iii).

Plaintiffs have successfully met all three criteria.  First, Iran has been designated as a

state sponsor of terrorism by the U.S. State Department since 1984—a designation that was in

effect at the time of the attacks.  49 Fed. Reg. 2836 (Jan. 23, 1984).  Second, all Bellwether

Plaintiffs were U.S. nationals at the time of the attacks.  Tr. (July 23, 2024) at 193; Tr. (July 25,

2024) at 57, 74, 106, 131, 163, 187.  Third, because the attacks took place in Iraq, not Iran,

Plaintiffs were not required to offer Iran an opportunity to arbitrate the claim.

In meeting these three criteria, the Bellwether Plaintiffs have established that Iran lacks

immunity under the FSIA and that the Court meets the statutory requirements to hear their claim.

They have thus established that the Court has subject-matter jurisdiction over this case.  *See* 28

U.S.C. § 1605A(a)(1), (2).

## B.  Federal Cause of Action

Because the Bellwether Plaintiffs have established subject-matter jurisdiction, "little else

is required to show" that they are entitled to relief under Section 1605A.  *Schwartz v. Islamic

Republic of Iran*, No. CV 18-1349, 2020 WL 7042842, at *14 (D.D.C. Nov. 30, 2020) (cleaned

up).  Section 1605A of the FSIA provides that state sponsors of terrorism are liable "for personal

injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an

official, employee, or agent of that foreign state, for which the courts of the United States may

maintain jurisdiction under this section for money damages."  28 U.S.C. § 1605A(c).  "In other

words, this section creates a cause of action for the same conduct that gives rise to jurisdiction

under the terrorism exception." *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017). The statute authorizes suits for money damages by three categories of plaintiffs: (1) U.S. nationals; (2) members of the U.S. armed forces; and (3) employees of the U.S. government—or the legal representative of any such individuals. *See* 28 U.S.C. § 1605A(c).

Given the overlap between the jurisdictional requirements and the elements of a cause of action under the terrorism exception, and because each Bellwether Plaintiff satisfies at least one of the statutory categories of eligible plaintiffs, their entitlement to relief is well established. The findings of fact and conclusions of law set forth above demonstrate Iran's liability and confirm that the Bellwether Plaintiffs meet the substantive requirements of the statute.

## V. DAMAGES

On May 30, 2025, the Special Master provided her recommendation on damages for the Bellwether Plaintiffs. The Court has reviewed it and, finding it sound in all respects, adopts it in full as part of this Opinion. *See* Attachment 1. Each Bellwether Plaintiff is entitled to the damages outlined in the accompanying Order, Dkt. 59.

## VI. CONCLUSION

The Bellwether Plaintiffs served their country with unwavering courage and exceptional distinction. Their sacrifice demands more than acknowledgment—it calls for our enduring gratitude and deepest respect. For, as Elmer Davis observed, "[t]his nation will remain the land of the free only so long as it is the home of the brave." This Memorandum Opinion is a small step toward honoring that truth.

Date: May 30, 2025

_____
ANA C. REYES
United States District Judge

# ATTACHMENT 1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JAMES SWINNEY, *et al.*, | ) | |
| | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | No. 1:20-cv-2316 (ACR) |
| v. | ) | |
| | ) | |
| ISLAMIC REPUBLIC OF IRAN, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

**REPORT AND RECOMMENDATION OF THE**
**SPECIAL MASTER REGARDING COMPENSATORY DAMAGES**
**FOR THE SWINNEY BELLWETHER PLAINTIFFS**

This case involves numerous terrorist attacks against United States servicemembers and civilians serving in Iraq from 2003 to 2011. The Plaintiffs are the Direct Victims of these attacks and their family members. The Defendant is the Islamic Republic of Iran ("Iran"). Plaintiffs allege that Iran caused their injuries by providing material support to terrorist organizations operating in Iraq, including al-Qaeda in Iraq. Plaintiffs seek compensatory and punitive damages under the state sponsor of terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A. Iran has not answered or otherwise appeared in this action. The Clerk of the Court entered default against Iran.

The Court held a bellwether hearing to evaluate liability and damages under the FSIA. The Court appointed the undersigned to analyze and recommend damages for the non-bellwether Plaintiffs and also requested a review of the compensatory damages claims of the bellwether Plaintiffs. Dkt. 58. This Report addresses only the compensatory damages claims of the bellwether plaintiffs.

1

## BRIEF BACKGROUND

Section 1605A(c) of the FSIA creates a private right of action for money damages for United States nationals, members of the U.S. armed forces, and United States government employees or contractors (acting within the scope of their employment) who are injured or killed by terrorist acts carried out by officials, employees, or agents of a foreign state that is designated as a state sponsor of terrorism. *See* 28 U.S.C. § 1605A(c). Family members of those injured or killed in such terrorist acts may also seek money damages for their own injuries. Qualified plaintiffs may seek compensatory damages including economic damages, solatium damages, and pain and suffering damages.[1]

The determination of the appropriate amount of compensatory damages depends on the specific facts and circumstances of each claim and the evidence submitted in support of the claim.

The administrative plan outlined in the Court's order of appointment specifies the applicable evidentiary standards:

> As to the admissibility of evidence, the Special Master shall be guided by the Federal Rules of Evidence, but it shall not be necessary for documents to be qualified as genuine pursuant to Federal Rule of Evidence 901. Authentication shall be made by any counsel's representation as an officer of the Court that a proffered document is an accurate copy of what counsel proffers it to be. Moreover, the Special Master shall be guided by the opinion of the United States Court of Appeals for the D.C. Circuit in *Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017) with respect to the entry of evidence in terrorism cases under the FSIA when defendants fail to appear and thereby default.

*Id*. at II.

> Testimony may be received by sworn declarations. All of Plaintiffs' evidence shall be preserved by Plaintiffs' counsel, who shall retain it for use by the Court. The Special Master shall be guided in reviewing and evaluating claims by Foreign Sovereign Immunities Act ("FSIA") opinions, including, but not limited to: Stethem v. Islamic Republic of Iran, 201 F.Supp.2d 78 (D.D.C. 2002); Salazar v. Islamic Republic of Iran, 370 F. Supp.2d 105 (D.D.C. 2005); Estate of Heiser v. Islamic Republic of Iran, 466 F. Supp. 2d 229, 269, 318 (D.D.C. 2006); Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 85 (D.D.C. 2010); Fritz, et al. v. Islamic Republic of Iran,

---

[1] *See* 28 U.S.C. § 1605A(c).

324 F. Supp. 3d 54 (D.D.C. 2018); Schooley et al. v. Islamic Republic of Iran, 2019 WL 2717888 (D.D.C. 2019); Allan v. Islamic Republic of Iran 2019 WL 2185037 (D.D.C. 2019); *Frost et al. v. Islamic Republic of Iran*, 419 F. Supp. 3d 112 (D.D.C. 2020), *W.A. et al. v. Islamic Republic of Iran*, 2020 WL 7869218 (D.D.C. 2020); *W.A. et al. v. Islamic Republic of Iran*, 2020 WL 7869211 (D.D.C. 2020); *Fritz v. Islamic Republic of Iran*, 466 F.Supp.3d 13 (D.D.C. 2020); *Selig v. Islamic Republic of Iran*, 2021 WL 5446870 (D.D.C. 2021); and their progeny.

*Id.*

The first portion of this Report and Recommendation sets forth factual findings for each of the Swinney Bellwether Plaintiffs. The second portion of the Report and Recommendation outlines the applicable case law. The third portion of this Report and Recommendation sets forth my recommendations for compensatory damages for each of the Swinney Bellwether Plaintiffs.

## FACTUAL FINDINGS

The Swinney Bellwether Plaintiffs are the Estates of Direct Victims, Direct Victims who were injured, and family members of the Direct Victims.   The Direct Victims are:  Estate of Cpl. Jonathan Ross Spears; Estate of Sgt. Daniel Varnado; SPC Lance A. Gieselmann; LCpl. Kevin J. Rumley; SSG Richard S. Ford; SPC Timothy J. Pope Jr.; SPC Michael S. Anderson.  The family member plaintiffs are:  Timothy Spears, Jessica Wollen, Jennifer Glodfelter, Sharon Shavers, Kannon Varnado.

The Direct Victims and the Estates of Direct Victims seek economic loss damages and the injurid Direct Victims seek economic loss damages and pain and suffering damages.  Each of the family member plaintiffs seeks an award of solatium damages.  All of t h e  Plaintiffs have submitted documentation establishing that they are United States Nationals within the meaning of Section 1605A.

The first section of this Report sets forth factual findings pertinent to the determination of compensatory damages. The second section outlines relevant case law. The third section sets forth recommendations for compensatory awards.

3

## FACTUAL FINDINGS

The claims of the Direct Victims who were injured are supported by their testimony at the "Bellwether Hearing" on default and by a report prepared by Dr. Shean Eric Phelps, MD, MPH | LTC, U.S. Army (RETIRED).  Dr. Phelps did not personally examine the individual plaintiffs but reviewed and evaluated the medical records for each of the plaintiffs.  Dr. Phelps is a medical doctor who received his degree from the Uniformed Services University of Health Sciences, F. Edward Hebert School of Medicine, Bethesda MD.  Dr. Phelps served in the Army for 30 years and was deployed overseas.  He has specialized knowledge of the use of IEDs and traumatic injuries sustained in combat.  He has served as an expert in at least one FSIA case.  The Court qualified Dr. Phelps as an expert in combat injuries, polytrauma, blast injuries, and IED related injuries.  Bellwether Hearing Transcript, July 25, 2024, at 14.  Dr. Phelps testified about the extensive types and severity of injuries caused by Improvised Explosive Devices – devices that caused injuries to some of the Direct Victim plaintiffs.

Plaintiffs have also submitted reports prepared by John Cary – addressing the vocational and life care impact of the physical injuries sustained by the Direct Victims and the psychological injuries sustained by family members of Direct Victims who were killed.  These reports were submitted as exhibits at the Bellwether Hearing.  To address certain components of economic loss, the Plaintiffs have also submitted reports prepared by Richard Hoffman.  The credentials and scope of these reports are addressed below in the relevant sections.

Following are factual findings with respect to each of the bellwether plaintiffs.

## DIRECT VICTIMS

### A.  CPL. JONATHAN ROSS SPEARS

Corporal Jonathan Ross Spears was killed on October 23, 2005, in Ramadi, Iraq, when a

sniper shot him while he was securing a rooftop. Spears was posthumously promoted to Corporal and awarded the Purple Heart Medal. He served as a Rifleman and Acting Squad Leader with Company I, 3rd Battalion, 7th Marine Regiment.

Corporal Spears was 21 years old at the time of his death and the evidence in the record indicates that he was killed instantly.

### B. SERGEANT DANIEL RYAN VARNADO

Sergeant Daniel Ryan Varnado was killed in action on May 23, 2005, in Haswa, Iraq, when his military vehicle was struck by an improvised explosive device (IED) provided by Iran or its agents. At the time of his death, SGT Varnado was 23 years old and had served for a total of 41 months. He was posthumously awarded the Bronze Star and Purple Heart Medals, among other military honors.

SGT Varnado was a member of the United States Army Mississippi National Guard, serving as an Infantryman in C Company, 1st Battalion, 155th Infantry Regiment. He enlisted on November 16, 2000, and was deployed to Hasawa, Iraq, on July 30, 2004. The attack that claimed his life also resulted in the immediate death of three other soldiers. On the day of his death, he was posthumously promoted from Specialist to Sergeant, recognizing his bravery and dedication.

The evidence in the record shows that Sergeant Varnado was killed instantly.

### C. SPECIALIST LANCE ASHLEY GIESELMANN

Specialist Lance A. Gieselmann suffered catastrophic injuries from an IED attack on October 28, 2003, while serving as a tank crewmember in Iraq. His service in the United States Army spanned from May 20, 1999, to May 19, 2004. Specialist Gieselmann testified that he was in the turret of the tank at the time of the attack and woke up 50 yards away.  Bellwether Hearing Transcript at 85.  Specialist Gieselmann testified about the IED attack:

My foot was up by my head. My face had been blown apart. My legs were paralyzed. I cracked my -- I remember my CVC helmet was cracked in half. My chest hurt from a piece of shrapnel that went through my body armor.

Bellwether Hearing Transcript at 82:13-16

While he was lying on the ground helpless, he saw a truck pull up and thought he would be shot.

He remained still, hoping that it would appear that he was dead. Bellwether Hearing Tr. at 84.

Specialist Gieselmann spent a year in the hospital for treatment for his extensive injuries. *Id.* at 92. He underwent multiple surgeries, including a revised left transfemoral amputation and spinal fusion, received extensive rehabilitation at Walter Reed Army Medical Center and the Spinal Cord Injury Center in Memphis. He testified that he received skin grafts and has limited motor function in his right leg. *Id.* at 94. He cannot smile because his face was reconstructed. *Id.* at 96. He has pain and cramping from his scars. *Id.* His leg is weak and he does not have bladder or bowel control. *Id.* at 96.

The attack resulted in severe polytraumatic injuries, including a traumatic brain injury, spinal cord injury, left leg amputation above the knee, L1 Burst Fracture (requiring posterior fusion and surgical stabilization), incomplete T12 spinal cord injury with residual bowel and bladder dysfunction, facial lacerations, and Post Traumatic Stress Disorder. Report of Shean Phelps, MD, MPH, Bellwether Hearing Exhibit P0329.[2]

He experiences chronic issues such as phantom limb pain, lower back and hip pain, and nerve damage. Psychological challenges include PTSD, memory problems, and cognitive deficits, with symptoms of survivor's guilt and hyper-vigilance.

Gieselmann's prognosis remains guarded. Dr. Phelps provided his prognosis:

Mr. Gieselmann 's prognosis remains complex. His physical health issues, particularly chronic phantom limb, and back pain (including chronic muscular spasm), along with the attendant balance problems expected in an above the knee (ATK) amputee, require ongoing, life-long physical therapy with a high potential for necessary follow-on surgical

---

[2] Specialist Gieselmann submitted a declaration confirming that he has read the report of Dr. Phelps and that it accurately reflects his injuries and condition. Dkt. 57-1.

interventions. Residual bowel, bladder and erectile dysfunction necessitates his attending regular follow-ups with a host of medical specialists to include, but not limited to neurology, gastroenterology, and urology.

Gieselmann 's mental health prognosis is equally challenging. He requires continuous support from mental health professionals, including therapy and medication management, to address his PTSD and depressive episodes. Regular mental health check-ins and adjustments in his treatment plan are essential to manage his ongoing suicidal ideation and severe depressive symptoms."

*Id.* at 5.

His wife, Ashlee Carole Gieselmann, is his full-time caregiver, providing over 40 hours of care per week. The family faces financial difficulties due to unpaid medical bills and his inability to work. Home modifications are necessary to address accessibility issues and improve safety.

### D. STAFF SERGEATN RICHARD S. FORD

Staff Sergeant Ford served from 1982 to 2020, with multiple activations and deployments, including a deployment to Iraq in 2005. On February 3, 2005, while deployed in Iraq, Ford was in a Humvee that was struck by an improvised explosive device (IED). The explosion resulted in the death of the driver and left Ford with multiple injuries, including traumatic brain injury (TBI), PTSD, traumatic arthritis, hearing loss, and other conditions.

The expert report prepared by Dr. Shean Phelps describes Sergeant Ford's injuries:

Post-Traumatic Stress Disorder with Residuals of Traumatic Brain Injury; Traumatic Arthritis of the Left Knee with Decreased Range of Motion Status, requiring Total Knee Replacement; Tinnitus; Left Upper Extremity Essential Tremors, Parkinsonism; Right Upper Extremity Essential Tremors, Parkinsonism; Residuals, Traumatic Brain Injury (To Include Memory Loss). Report of Dr. Shean Phelps, Bellwether Hearing Exh. P0328.[3]

---

[3] Sergeant Ford submitted a declaration confirming that he has read the report of Dr. Phelps and that it accurately states his injuries and medical condition. Dkt. 57-3.

Dr. Phelps provides the following description of Sergeant Ford's injuries, treatment, and prognosis:

> Post-traumatic stress disorder (PTSD) and TBI have led to persistent headaches, anxiety, irritability, memory issues, and tremors. His conditions significantly impact his daily life, limiting physical activity and social interactions. He requires ongoing medical and psychiatric care to manage chronic pain, PTSD, and other health issues, with no significant improvement in his overall condition anticipated. His prognosis indicates the need for lifelong support and adaptive strategies to maintain quality of life. Mr. Ford's mental health has been severely affected, leading to a diagnosis of Post-Traumatic Stress Disorder (PTSD) with residuals of traumatic brain injury. He endorses symptoms consistent with major depressive disorder or other underlying mood disorders, likely attributable in part to his TBI and PTSD. He frequently experiences episodes of irritability and insomnia, coupled with increased anxiety, hypervigilance, and avoidance of crowded areas. His VA rating stands at 100% for multiple service related injuries, reflecting the severity of his conditions.
>
> Despite receiving extensive medical treatments, including behavioral and physical therapy, joint arthroplasty (left knee replacement), and assessments for TBI and PTSD, Mr. Ford's prognosis remains complex. His physical health issues, particularly the chronic knee pain and balance problems secondary to early onset traumatic arthritis and the long-term aftereffects of TBI, will likely require ongoing physical and occupational therapy, and potentially additional surgical interventions (i.e., further joint replacement surgery). His documented hearing loss and tinnitus necessitate regular follow-ups with audiology and otorhinolaryngology.
>
> Mr. Ford's mental health prognosis is equally challenging. He requires continuous support from mental health professionals, including therapy and medication management, to address his PTSD and depressive episodes. Regular mental health check-ins and adjustments in his treatment plan are essential to manage his ongoing suicidal ideation and severe depressive symptoms.
>
> Overall, the combination of physical pain and mental health challenges significantly impact his daily functioning and quality of life.

*Id.*

Ford's family relationships have been strained due to his extensive care requirements and emotional damage. He lives with his daughter and grandchildren, who assist with household tasks, but his conditions limit his ability to engage in family activities.

### E. MICHAEL ANDERSON

Specialist Michael Scott Anderson sustained severe injuries from a suicide bomber attack

on December 20, 2007, in Kan'an, Iraq. Specialist Anderson testified at the bellwether hearing that he was on a supply run and hearing back and the next thing he knew, he was waking up on the ground. Bellwether Hearing Tr. at 167. They had been attacked by a suicide bomber. *Id.* at 169. He was dazed but he could see bones sticking out of his leg. *Id.* at 170. He was evacuated to Germany and then to the United States for treatment. Tr. 171. He has been disability rated for TBI, PTSD, shrapnel, perforated ear, and eye damage. *Id.* at 176. He had long term mobility issues. *Id.* at 177. He is not working.

The Report of Dr. Phelps describes Michael Anderson's injuries and prognosis:

Anderson suffered burns and shrapnel wounds to both legs, a perforated tympanic membrane in the right ear, and a concussion with symptoms of traumatic brain injury (TBI). These injuries have led to chronic dizziness and balance difficulties, persistent pain, and reduced mobility in his left knee. He also experiences hearing loss and tinnitus in his right ear.

Anderson's mental health has been severely affected, leading to a diagnosis of Post-Traumatic Stress Disorder (PTSD) with major depressive disorder. He frequently experiences episodes of irritability, insomnia, and suicidal ideation, coupled with increased anxiety, hypervigilance, and avoidance of crowded areas. His VA rating stands at 100% for multiple service-related injuries, reflecting the severity of his conditions.

Despite receiving extensive medical treatments, including wound care, physical therapy, and assessments for TBI and PTSD, Anderson's prognosis remains complex. His physical health issues, particularly the chronic knee pain and balance problems, require ongoing physical therapy and potentially surgical interventions. The hearing loss and tinnitus necessitate regular follow-ups with audiology and otorhinolaryngology specialists.

Report of Dr. Phelps, Bellwether Hearing Exh. P0327 at 8, 9.

Anderson completed his active service on September 6, 2011, with an honorable discharge.

## F.   KEVIN JAMES RUMLEY

Lance Corporal Kevin J. Rumley, a United States Marine, sustained catastrophic injuries from an improvised explosive device (IED) on April 8, 2004, during a patrol in the Iraqi Al Anbar province along the Syria-Iraq border. Kevin Rumley served from August 2003 to November 2005

as an 0311 Marine Rifleman.   Rumley was deployed to Iraq from February 16, 2004, to April 12,

2004. Testimony of Kevin Rumley, Bellwether Hearing at 188, 189.

He testified that he was on patrol and on his way back when the bomb detonated.  *Id*.  at

190.  When he came to, he could see that his thigh and knee were 'blown up', and he had shrapnel

in his eye, biceps, and hands. *Id*.  at 191.  He was sent to Germany and then Walter Reed.  He had

32 surgeries, and spent a year and a half in Walter Reed. Tr. at 195.  He struggled when he was

released.  He had been living with opioid pain killer and when he got out of the hospital, he became

addicted to opioids and eventually to heroin.

Plaintiff submitted the Report of Dr. Phelps – which described Kevin Rumley's injuries and

prognosis:

> He had sustained a traumatic brain injury (TBI), a broken right femur, multiple
> fragmentation wounds to both legs, his right arm, left shoulder, face, and right hand along
> with extensive 3rd degree burns and nerve damage to both lower extremities.
>
> Such "disassociation" immediately following exposure to a blast event is extremely typical
> and signifies a significant neurological disturbance secondary to either the primary or
> secondary blast wave, or both.
>
> Following initial life-saving treatment and surgery, he was aeromedically evacuated
> (AIREVAC) by United States Air Force assets to the National Navy Medical Center 5 days
> post injury. He spent several weeks hospitalized where he underwent open reduction and
> internal fixation of his right femur, with repair to the left supracondylar and medial aspect
> of his left femoral condyle, and to his right 5th phalanx fracture. A subsequent secondary
> MRSA wound infection of the surgical site to his right hand required transfer to Walter Reed
> Army Medical Center for a subsequent fixation plate removal and extended duration IV
> antibiotics followed by aggressive physical rehabilitation.
>
> Once at Walter Reed, he underwent surgical intervention for the MRSA infection and
> received a left sciatic and right femoral catheter to control residual pain. He continued to
> undergo additional surgeries including full and split thickness skin grafts to the wounds at
> his left medial thigh, a compartment fasciotomy of his left leg (to reduce pressure on the
> underlying muscles and nerves), and eventually a left saphenous vein graft to increase
> circulation to his left lower extremity. LCPL Rumley continued to experience severe
> neuropathic pain and weakness in his lower extremities. He attended regular inpatient
> physical therapy to help increase mobility, reduce pain, and build strength to walk again.
> Unfortunately, his limb pain persisted, and he eventually underwent total right knee
> arthroplasty in October 2004. The entirety of his inpatient hospitalization accounted for 1½

10

years and a total of 32 surgeries. Once released from Walter Reed, Rumley kept attending physical therapy yet continued to suffer from chronic debilitating pain and had to rely on the use of a wheelchair for mobility to take the weight off his injured lower extremities.

Since Rumley's injury he has lost most of his vision in his left eye due to retained fragmentation from the IED blast. He has continual pain in both lower extremities and suffers from chronic headaches that seem to occur concurrently with a pronounced decline in his short-term memory. He has tried numerous avenues to help alleviate the pain but has found no significant relief. He was prescribed opiates while at Walter Reed and later became addicted. His IED induced polytrauma is exacerbated by the persistent symptoms of PTSD for which he has (unsuccessfully) tried to attenuate through self-medication with nonprescription and prescription opiates and alcohol.

Report of Dr. Phelps, Bellwether Hearing Exh. P0332.

Kevin Rumley overcame his addiction problem and went back to school. He graduated with a PhD in Social Work in May 2024 and is currently employed.

Vocational Assessment and Life Care Plan, Dr. John Cary, Bellwether Hearing Exh. P0039 - 00035.

### G.   TIMOTHY DWIGHT POPE, JR.

Timothy Dwight Pope, Jr. was injured in Iraq on February 24, 2005.  Testimony of Timothy Pope, Bellwether Hearing Tr. at 134.  He was in the lead tank in a route clearance mission.  *Id.* at 137.  He was eventually transferred to Walter Reed for treatment.  He testified that he had an open wound, required extensive treatment with antibiotics, surgery to repair damage to his hip and pelvis.  *Id.* at 145, 146.  He was prescribed opioids for pain and ended up with an addiction*. Id.* at 151.  He testified that he is now off of opioids (since 2018).  *Id.* He was discharged in 2007 and secured some employment in the civilian sector.  He was abusing alcohol during that time and his marriage fell apart.  *Id*. at 153, 154.  He testified that he had planned to make the military his career.  *Id.* at 154.

Plaintiff submitted the Report of Dr. Phelps. Bellwether Hearing Exh. P0330.    Dr. Phelps described the injuries suffered by Timothy Pope and provided his own evaluation and prognosis.

United States Army Corporal Timothy Pope Jr. suffered devastating blast-induced injuries after his M1 Abrams main battle tank ran over two anti-tank mines during route clearance operations near the city of Tikrit, Republic of Iraq, resulting in life-threatening polytraumatic injuries.

On February 24, 2005, CPL Pope was driving a M1A1 Abrams main battle tank when an IED exploded beneath his seat. He was less than 10 feet from the blast. It required 30 minutes for rescuers to extract him from the destroyed tank. He sustained head trauma, left forearm, right foot and tibia, spleen and liver trauma, scrotal hematoma, left hip and pelvic fracture, and left femur fracture. He was not unconscious during the rescue but does not remember anything else during that day.

After the initial treatment for his numerous injuries, CPL Pope underwent emergency surgery and stabilization. His initial surgeries including exploratory laparotomy at the Combat Support Hospital located at Joint Air Base-Balad, Iraq on February 25. Preliminary medical and surgical procedures included precautionary intubation and deep sedation in face of the need for extended surgical intervention and stabilization for transport to higher levels of medical care. His initial surgeries included abdominal laparotomy/exploration (ExLap), repair of a traumatic hernia, cauterization of a superficial splenic laceration (likely a rupture of the spleen due to the primary blast overpressure event or secondary blast effects), closure of abdominal fascia, a right knee arthrotomy, irrigation and debridement of a lacerated right knee, a four compartment fasciotomy (excision of the overlying skin down to the subcutaneous fascial layer to relieve pressure and alleviate potential damage and necrosis of underlying muscle tissue) of right leg, left leg wound incision and drainage, wound extension to a fracture site within his left femur, and a surgical external fixation of the left femur. He required multiple blood transfusions and extensive fluid resuscitation during his initial weeks of care and hospitalization.

Report of Dr. Phelps,  at 0003.

Dr. Phelps further states:

Since the IED attack, he has suffered from persistent headaches with photophobia (sensitivity to light) and hyperacusis (extreme sensitivity to noise), tinnitus, gait and balance problems, memory issues, and major depressive symptoms. He was diagnosed with PTSD in 2007 and on June 24, 2012, he was admitted to a psychiatric ward for PTSD with major depressive features. He stated at the time that he was having a "psychotic breakdown" and reported that he was not sleeping or eating, and that the lithium he was given was "not working."

*Id.* at 0004.

Dr. Phelps reports that Timothy Pope has been diagnosed with: Spleen and liver trauma;  Left hip and pelvic fracture; Left femur fracture;    Left forearm trauma;    Right foot and tibia trauma; Scrotal hematoma; Major depression with post-traumatic stress disorder; Severe secondary-related

mental health conditions ; Removal of his bottom row of teeth; Head trauma.  *Id.*


**INDIRECT VICTIMS: FAMILY MEMBERS**


**A.   FAMILY OF CORPORAL SPEARS**

**1. TIMOTHY LAWRENCE SPEARS (FATHER OF CPL. JONATHAN ROSS SPEARS)**

Timothy Spears provided testimony at the Bellwether Hearing.  He remembered Jonathan as a rambunctious child.  He recounted the process Jonathan went through to join the Marines. And he testified about the moment he learned of Jonathan's death.  Bellwether Hearing Transcript 1, at 194-197.  He described the overwhelming grief and emotional turmoil.  His wife, Jonathan's mother, was grief stricken and spiraled downward until she took her own life at Jonathan's grave site.  *Id.* at 199.  Jonathan's sisters both had difficulties after Jonathan's death including anxiety, panic attacks, and depression.  *Id.* at 200.  Timothy no longer has much desire to go out.  *Id.* at 201. He testified about the experiences of his two daughters and his efforts to make sure his son is remembered.

Following Jonathan's death, Timothy was unable to work for two months.  *Id.* at 200. According to the interview notes in the report of John Cary, Timothy Spears continued to work at his long time job until 2015 and then moved to another job until 2018 when he was diagnosed with polymyositis.  Cary Report, Bellwether Hearing Exh. P 30240.

**2. JESSICA WOOLEN (SISTER OF CPL. JONATHAN ROSS SPEARS)**

Jessica Woolen, formerly Jessica Spears, submitted a declaration in support of her claim. Decl. of Jessica Woolen.[4]   Jessica was just eleven years old when she learned of her brother Jonathan's death.  She was the one who answered the door when the Marines came to inform the

---

[4] The Declaration of Jessica Woolen is maintained by the undersigned and can be provided to the Court promptly.

family, an experience that has left lasting psychological effects. The loss of her brother led to severe mental health issues.  She was eventually diagnosed with Major Depressive Disorder and Generalized Anxiety Disorder, which continue to affect her.  She has spent over a decade with mental health professionals and has been treated with 7 antidepressant medications.  She attempted suicide at age 17.

Jessica's mental health challenges have affected her education and career. She has had to withdraw from courses due to depression and anxiety.  She has faced significant financial losses due to unreimbursed tuition. She has been enrolled for nearly 8 years attempting to get her Bachelor degree.  Despite these challenges, Jessica is close to completing an accounting degree from the University of West Florida.

The emotional toll of losing Jonathan was compounded by the suicide of their mother three years later.   She states that her brother's death and its effects have affected her health:  she had two miscarriages potentially linked to her mental health conditions. She rarely leaves the house, is socially isolated and carries the grief of her loss with her at all times.

### 3.  JENNIFER GLODFELTER (SISTER OF CPL. JONATHAN ROSS SPEARS)

Jennifer Glodfelter, formerly Jennifer Spears, is the sister of Jonathan Spears.  She provided declaration testimony in support of her claim.  Decl. of Jennifer Spears.[5]  She was only nine years old when her brother was killed. *Id*.

In her declaration, Jennifer states that her 'world changed instantly' when she learned of her brother's death.  She not only lost her brother, but she lost her mother as well. Her mother struggled with grief and three years later took her own life at Jonathan's gravesite.  She missed out on a real childhood and functioned without the emotional support children take for granted.  She

---

[5] The Declaration of Jennifer Spears is maintained by the undersigned and can be provided to the Court promptly.

continues to feel the emotional consequences and carries the grief.  The loss continues to influence her views on family, safety, and love, leaving her with enduring emotional pain.

### B.  FAMILY OF SERGEANT DANIEL RYAN VARNADO

Daniel Varnado is survived by his wife, Sharon Michelle Shavers-Varnado, and his son, Kannon Joshua Varnado.

### 1.  SHARON SHAVERS-VARNADO (WIDOW OF DANIEL VARNADO)

Sharon Shavers-Varnado testified at the Bellwether hearing on July 25, 2024. Bellwether Hearing Transcript, July 23, 2024, at 57-67. Sharon Shavers described her romance with and marriage to Sergeant Daniel Varnado.  When Daniel was deployed, Sharon took a course in cosmetology. The plan was that she would be able to work to support the family when Daniel came back and started school.  She describes being in a daze when she learned of Daniel's death.  She was only 20 years old when her husband was killed. Shortly after Daniel was killed, Sharon was caught in Hurricane Katrina and did not have a stable place to live for some time.  She described having memory issues because she was in 'survival' mode for so long.  She has worked with psychiatrists to address these issues.  Sharon remarried in 2006 – and her husband was also in the military and suffers from PTSD.

### 2.  KANNON JOSHUA VARNADO (SON OF DANIEL VARNADO)

Kannon Varnado, the son of Sergeant Daniel Varnado and Sharon Shavers, was  a toddler when his father was killed in action. Kannon Varnado provided deposition testimony in support of his claim.  Deposition of Kannon Varnado.[6]  Kannon never knew his father – but he testified that he heard many stories about his dad growing up.  He felt the loss of his father and it hit him particularly hard when he entered middle school.  It was 'tough'.  He recalls having a dream about

---

[6] The transcript of the deposition of Kannon Varnado is maintained by the undersigned and can be provided to the Court promptly.

his father and crying when he woke up. He felt empty and lonely growing up. He had a connection to his father through baseball. Daniel was a baseball player and Kannon has followed in his footsteps. He met many people who knew his father – and at times it felt like he had to live up to his father's memory. He has had a difficult relationship with his father's side of the family. He felt all the emotions of the loss of his father when he got older and realized what had happened. He often thinks about what life would be like with his father.

 As he matured, he was introduced to Danny's military life, which provided a broader understanding of his father's legacy. His life has been heavily influenced by his father's legacy, with constant reminders through community connections and expectations in sports.

Sharon Shavers believes that Kannon missed out on having Danny as a life coach and best friend, emphasizing that the absence of a father is an irreplaceable void in Kannon's life, which continues to affect him deeply.

## ANALYSIS OF COMPENSATORY DAMAGES

### I.    ECONOMIC LOSS ANALYSIS

"Section 1605A of the FSIA explicitly provides that foreign state-sponsors of terrorism are liable to victims for economic losses stemming from injuries or death sustained as a result of the foreign state's conduct." *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 48 (D.D.C. 2016) (Syrian Arab Republic was liable to citizens' estates and families, under FSIA, for economic losses) (citing 28 U.S.C. § 1605A(c)). *See also Roth*, 78 F. Supp. 3d at 402; *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83 (D.D.C. 2010).

Economic loss damages must be supported by credible evidence and may be proven by the submission of a forensic economist's expert report that is based on reasonable data and assumptions. *Winternitz v. Syrian Arab Republic*, No. CV 17-2104 (TJK), 2022 WL 971328, at *10 (D.D.C. Mar. 31, 2022) ("The report of a forensic economist may provide a reasonable basis for determining the amount

of economic damages in an FSIA case") (citing *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012)); *Roth*, 78 F. Supp. 3d at 402 (citing *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 24 (D.D.C. 2009)). "In considering an award for lost future earnings, the Court shall take account of the reasonableness and foundation of the assumptions relied upon by the expert." *Roth*, 78 F. Supp. 3d at 402 (citing *Reed, supra*, 845 F. Supp. 2d 204, 214); *see also Thuneibat*, 167 F. Supp. 3d at 48-49.

The "estate of a plaintiff who would have had standing to sue 'is expressly covered by, and entitled to bring claims under, Section 1605A(c).'" *W.A. v. Islamic Republic of Iran*, 427 F. Supp. 3d 117, 138 (D.D.C. 2019) ("W.A. I") (quoting *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 78-79 (D.D.C. 2017)). In order for an estate-plaintiff to bring an action under the FSIA, "the plaintiff must first establish the estate's standing, or '[its] power . . . to bring and maintain legal claims.'" *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 36 (D.D.C. 2020) ("Barry II") (quoting *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 85 (D.D.C. 2017) ("*Cohen I*")). The "threshold question regarding the 'power of the estate to bring and maintain legal claims'" is governed by the "law of the state which also governs the creation of the estate." *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 333 (D.D.C. 2014) (quoting *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 12-13 (D.D.C. 2011)).

Plaintiffs have submitted reports of John Cary, who is an expert in vocational assessment and development of life care plans and Richard Hoffman – who is a CPA and certified valuation analyst in support of each claim for economic loss damages. The Plaintiffs seek economic loss for all of the bellwether plaintiffs, including family members of Direct Victims.

The economic loss submissions include an evaluation of earning capacity before the attack (which is presented as an overall earning capacity for the duration of work life) prepared by John Cary and a separate computation of economic loss adopting the underlying compensation data from John Cary as the initial step in the calculation process. The damages submissions include a detailed analysis of future medical and care needs for each of the injured Direct Victims and for family members. The calculations of 'past economic loss' are presented in a format somewhat different than the typical

17

submission in FSIA cases.  Generally, courts have accepted loss analyses that start with a determination of the plaintiff's earning capacity based on history, education, and occupational goals that is then used to compute lost wages annual through the relevant period.  Typically the computations show the annual growth in wages based on factors such as inflation, standard growth rate observed for the particular occupation over a relevant period of time (reported in standard data sources), and programs for promotion for the average worker in the particular occupation.  In this case, the military pay scales published by the Department of Defense provide reasonable and ascertainable data to the extent that the loss assumes that the victim would have continued in the military.  The computation might also include a factor for lost benefits.  The analysis of lost wages include a deduction for costs – such as taxes and in some cases personal consumption.  For future projected loss, the methodology is the same but the growth factor might be a blended rate derived from multiple past years and the resulting amount of compensation projected for each year is discounted to present value.  The calculations presented here are different in certain respects, which are explained in the discussion regarding each specific victim below.

### A.    Economic Loss Damages: Estate of Jonathan Ross Spears (Direct Victim)

Plaintiffs have submitted two expert reports that address the computation of economic loss for the Estate of Jonathan Spears.  Mr. Cary[7] evaluated the Corporal Spears' capacity for earnings both in the military and in a civilian career.  He determined that the two were generally equivalent.  Mr. Cary determined (using a calculation function on a Department of Defense website) that the effective annual value of the compensation that Corporal Spears would have received had he lived to complete

---

[7] John Cary has a master's degree from Western Washington University's Woodring College of Education Rehabilitation Counseling, Class of 2014. He is a Certified Rehabilitation Counselor and Certified Disability Management Specialist. He has clinical experience in the medical, psychiatric, and psychosocial aspects of disability from working with and assessing individuals with a wide variety of injuries and disabilities in a clinical setting since 2005.  Cary Report, Spears Family, Bellwether Hearing Exh. P0340 at 00005.
P0340.00005

40 years of service in the military is $211,115.  This amount includes basic pay plus BAH and BAS

(which are allowances provided to the military for housing and other costs of living.)  He multiplies

that annual compensation amount by the number of years of expected work life - i.e. 40 years.  This

computation totals $8,444,592.  He then determines the value of the lost pension at $10,802,660.

In a communication with counsel, I requested further information and suggested that this type

of computation would not meet the requirements that courts have articulated in FSIA cases.  Counsel

then submitted additional economic loss calculations prepared by Richard Hoffman.[8]

Richard Hoffman provided a chart that adjusts the computations provided by Mr. Cary.  The

chart computes 'past loss' only through mid-2024 – (18.72 years of loss – as opposed to 40 years).

The calculation applies the same annual compensation amount of $211,115 as the starting point.  Mr.

Hoffman then applies a consumption factor deduction – which is appropriate and standard when

computing loss in the context of a wrongful death action.[9]  The consumption factor and the shorter

time period result in a past loss amount of $2,844,874.  Mr. Hoffman then computes future lost

earnings.  He begins with the compensation amount of $211,115 and applies a growth rate of 2.65%

for each year.  The growth rate was calculated based on an analysis of the growth rate of military pay

over a 20 year period.  He then applies the consumption rate deduction to the annual amount

computed for each year after adding in the growth rate.  He does not include any deduction for taxes.

Finally, he adjusts the resulting annual loss amounts to reduce them to present value.  He uses a

discount rate of 4.5% (which is based on the rate for a 20 year US Treasury Bond in 2024.)

---

[8] Mr. Hoffman is a Managing Director of Lone Peak Valuation Group. Prior to Lone Peak, he was a Managing Director in the international professional services firm of LECG. He has over thirty years of experience in public accounting and is a Certified Public Accountant. He is also accredited in business valuations through the American Institute of Certified Public Accountants. He has taught the proper methodology of calculating damages on behalf of the National Association of Certified Valuation Analysts.  He is the author of multiple articles.  Mr. Hoffman, in my view, has the appropriate qualifications to provide an expert analysis of past and future lost income.

[9] Mr. Hoffman applies date from the Personal Consumption by Family Type and Household Income, K. Krueger, based on the Consumer Expenditure Survey.

In another communication with counsel, I suggested that the amount provided for lost pension was stated incorrectly because it was the full value of a pension that would be paid over decades. The experts agreed and provided an adjusted pension amount which applied an appropriate present value discount. The experts also provided a factor that could be used to adjust the numbers to account for taxes. The total loss using these numbers and methodology and applying the tax adjustment[10] is: $8,427,858 for past loss including the present value of the lost pension and $2,039,333 for future loss (in present value terms). The methodology applied for the future loss and for the pension are reasonable and sound. The only issue with the future loss computation is the starting point:  the compensation amount of $211,115 is an amount that overstates the compensation level by approximately 3.6%.

I prepared a separate computation of the aggregate loss through the date of Mr. Cary's report using the same calculator from the DOD website by computing the loss for each year after Corporal Spears' death until mid 2024. The aggregate amount of loss before accounting for consumption and taxes is $3,302,705.68. The maximum annual compensation amount as of 2024 is $203,510. After applying a deduction for taxes and consumption, the past economic loss is: $2,074.760. The present value of the lost pension is: $5,945,705. The total past loss is the sum of these two numbers: $8,020,465.

My recommendation, after testing these calculations, is to adjust the past loss number per the calculation above for a total past loss of $8,020,465 and to accept the future loss number of $2,039,333. Although the starting point for the future loss calculation is slightly overstated, the computations do not incorporate any factor for promotions during work life and do not include

---

[10] The tax adjustment is applied only to the portion of the compensation that is actual pay and not to the benefits portion.

additional forms of pay – such as combat pay.  Accordingly, the compensation value is conservative – making it a reasonable basis from which to compute future loss.

      B.      **Economic Loss Damages: Estate of Daniel Varnado (Direct Victim)**

Plaintiffs submitted two reports addressing the economic loss computation for Sergeant Varnado.  Mr. Cary provided a report analyzing Daniel Varnado's pre death earning capacity under two different scenarios:  the first scenario assumes Daniel Varnado would have entered the work force as a civilian after completion of his tour of duty.  The second scenario assumes Daniel Varnado would have embarked on a military career.  In each case, Mr. Cary computes a compensation level from which he then computes total lost earnings and pension.  For the civilian career, Mr. Cary applied data regarding salaries for state and local government employees from the Bureau of Labor Statistics. I have reviewed the source cited but cannot identify the source of the actual numbers applied in Mr. Cary's report.   For the military career scenario, Mr. Cary has adopted a compensation level that would be achieved after 40 years of service and applies that to the past loss period (which is approximately 20 years of service.)  As noted in the discussion above, I prepared a computation using year by year compensation from the DOD website.  That computation yields an aggregate amount of lost compensation of $1,995,028 (compared to $2,916,946 computed by Mr. Cary and applied by Mr. Hoffman.)  Based on the year by year analysis, I recommend using the aggregate amount of $1,995,028 as the starting point for past loss and deducting the amount for taxes and consumption based on the data provided by Mr. Hoffman.[11] After applying those deductions, the past loss is $1,253,277.   The lost pension was computed by Mr. Cary and Mr. Hoffman on a present value basis at $1,912,045.  The total past loss using these calculations would be $3,165,322.

---

[11] Mr. Hoffman proposes a consumption deduction of 28% and advised that a reasonable tax rate would be 15%.  Taxes are only assessed on the salary portion of the total compensation and not on the benefits portion.

The future loss in the military scenario relies on the salary level computed by Mr. Cary of $152,442 as the starting point – but the year by year analysis shows that the salary level (including the designated benefits) in 2024 was $134,500.  Mr. Hoffman computed future lost earnings in the military scenario as $1,555,848.  This amount was computed using a higher starting compensation amount (as noted above) and does not account for taxes.  If adjusted for taxes using the factor indicated by Mr. Hoffman, the total amount is $1,357,478.  Although the starting compensation value for the future loss computation is higher than the number derived in the year by year analysis, again, the computation does not take into account likely promotions and other forms of pay relevant to those in the military.  Accordingly, given the inherent uncertainties in any future loss calculation, Mr. Hoffman's calculation provides a reasonable basis for the determination of future loss. Under the military scenario, applying the noted adjustments, the total loss would be $4,522,800.

**C.  Economic Loss Damages: Lance Ashley Gieselmann (Direct Victim)**

Lance Gieselmann has sustained extraordinary injuries as a result of the terrorist act and has severe ongoing medical, psychological, and financial challenges.  He requires ongoing medication, experiences constant complications from his injuries and the treatment for those injuries including persistent infections.  He is unable to perform simple tasks in a reasonable time frame due to his physical limitations.  He suffers from ongoing psychological injuries.  Lance Geiselmann is not able to sustain any reasonable employment and therefore is entitled to an economic loss award.

Mr. Cary prepared an analysis of Lance Gieselmann's earning capacity in the military, followed by a civilian career after retirement from the military.  This 'two part' career path is common among those in the uniformed services.  Mr. Cary determined the lost wages during the planned military service based on Department of Defense data (as described above).  Mr. Cary determined a likely compensation amount in a subsequent civilian career assuming that Mr. Cary would employ the

22

transferable skills obtained in the military in a civilian career and did not assume that Mr. Cary would obtain a college degree that might result in higher wages.  The compensation amount for the projected civilian career (including a pension amount) is based on the assumption that Lance Gieselmann would likely go into government service (as did many Gulf War veterans) and the salary level is based on the General Schedule (the schedule setting government pay scales).   In general, subject to the adjustment for taxes and reducing the pension amount to present value, these assumptions are reasonable and reliable. The past loss wages were computed by Mr. Cary based on an assumed salary including certain benefits of $70,411 for a total past loss of $1,056,165.  He computed a loss from a civilian career of $310,083 for a total of $1,366,248. I have conducted the year by year loss analysis using the same computation formula used by Mr. Cary and I compute a total loss of $1,430,288.30.  This amount should be adjusted for taxes which, using the rate provided by the experts, would reduce this amount to $1,247,927.  The present value of the lost pension – as computed by Mr. Cary and Mr. Hoffman -  is $1,030,393 - for a total past loss of $2,278,320.

Mr. Hoffman prepared a future economic loss computation that starts with the annual compensation level for civilian work computed by Mr. Cary as of 2024.  The computation then grows the  compensation amount each year applying a reasonable factor to determine an annual amount until the end of work life.  Mr. Hoffman then reduces the amount to present value for a total projected future loss of $1,137,427.  The data applied and the methodology are sound and supportable.  The computation does not take into account a deduction for taxes.  Accordingly, based on the further input from the expert, I have made a reduction to account for taxes.  The total amount of future lost wages applying the above factors and accounting for taxes is $966,813.  Accordingly, I recommend a total future loss for Mr. Gieselmann of $966,813.   Mr. Cary also computed future medical expenses. Although infrequent, courts have awarded past and future medical expenses as part of the compensatory damages in FSIA cases.  *See e.g. Khosravi v. Government of the Islamic Republic of*

23

*Iran*, Case no. 1:16cv 02066 (TSC) 2020 WL 492495 (D.D.C. August 21, 2020).  Mr. Cary includes in his report a detailed chart of past medical visits and an average cost for the types of treatment received.  In addition, the report includes the cost of equipment (wheelchairs and similar equipment) and extensive home modifications, adaptive recreational equipment, therapy dog, care givers, therapists, and future assistance with financial and similar matters due to cognitive impairment.  The list of care includes equine therapy, marriage counseling retreat, house cleaning, standard medications like aspirin, hibiclens, bandaids, and similar typical supplies.  The costs anticipate future surgeries, tests, x rays, and scans – and ongoing medication.  It includes a second residency, zero entry pool, holiday travel and pay for caregivers, skilled nursing.  The report notes that Mrs. Gieselmann currently spends approximately 40 hours a week as a caregiver.  The report does note that some care and some costs might be covered by VA or other benefits to which Mr. Gieselmann is entitled but does not quantify those benefits.

Mr. Hoffman prepared a chart computing the overall costs of the treatment and other items identified in Mr. Cary's report including an inflation factor for the increases in the cost of medical care and a present value discount.  The total discounted costs per Mr. Hoffman's computation over Mr. Gieselmann's expected lifetime is $22,726,590.  This is an extraordinary amount.  In the case cited above the future medical expenses totaled approximately $275,000.  Although Mr. Gieselmann's situation is extremely sympathetic, it seems that many of these costs would be covered by his benefits – and some are perhaps speculative – because they anticipate the need for various evaluations, treatments, and tests in the future for *potential* effects of his injuries.  Given these uncertainties and the lack of data on the treatment and benefits that will be provided through the VA and other sources, it is difficult to recommend an award for medical costs.  I suggest that this issue could be the subject of further investigation and if warranted a future additional award could be issued.

D. **Economic Loss Damages: Richard S. Ford (Direct Victim)**

Plaintiffs submitted the report of John Cary and the report of Richard Hoffman in support of the economic loss claim of Richard Ford. The analyses have the same components as the reports described above. In this case, however, Richard Ford did not leave the service after his injury. Instead, Richard Ford remained in the service for 7 more years but did not move up in rank. Mr. Cary concludes based on the medical evidence that Richard Ford had a diminished work capacity after the injury and that he would have been promoted had he not been injured. Mr. Cary therefore computes the amount of compensation lost due to the lack of promotion and discharge before the end of work life. Mr. Cary's calculations apply an annual compensation rate of $152,442 – which is the compensation amount Richard Ford would have earned after 39 years of service at a rank of E-9. See Report of John Cary, Bellwether Hearing Exh. P0335.00030. (Richard Ford was an E-6 when discharged but Mr. Cary has determined that he more likely than not would have been promoted to E-9 and would have completed his full military service at that level.) Mr. Cary calculates a past loss based on this annual compensation number of $2,134,183. The year by year analysis (as described above) yields a loss of $1,784,935 – adopting Mr. Cary's conclusion that Richard Ford would have achieved an E-9 level had he not been injured. After adjusting for taxes, the loss would be: $1,557,356. After adding the present value of the pension ($1,442,360) the loss would be $2,999,716. Mr. Cary deducted from his past loss calculation $92,400 – which are mitigating earnings – actual earnings that Richard Ford received for post discharge work. After deducting that amount, the past loss would be $2,907,316. Mr. Hoffman calculated the future lost earnings as $315,800. I recommend a past loss award of $2,907,316 and a future loss award of $315,800.

Mr. Cary provided an extensive list of projected future medical treatments and costs that would be incurred to provide various anticipated therapies and assistance – including various equipment, care givers, supplies, anticipated potential evaluations. As discussed above, while it is

25

reasonable to anticipate some medical expenses, and while the list is detailed and cost data is derived from actual costs, the total amount projected is very substantial ($10,518,068) and the analysis does not address costs and treatments that are provided through existing sources. I suggest that this element of damages requires additional proof and analysis – and I therefore recommend that it be submitted in a subsequent proceeding with more extensive support.

**E.    Economic Loss Damages: Kevin J. Rumley (Direct Victim)**

Plaintiffs submitted the report of John Cary and the report of Richard Hoffman in support of the economic loss claim of Kevin Rumley. The analysis follows the same basic structure described above. The past loss was calculated by Mr. Cary using a compensation level applicable to approximately 2024 – and applied to the years from the date of injury to 2024. That calculation yields a total amount for past earnings loss of $4,949,693. The year by year analysis applying the actual compensation amounts for each year yields a total of $4,770,071. Mr. Cary deducts an amount for residual earning capacity – of $1,198,766. After deducting this amount, the past lost would be $3,750,927 using Mr. Cary's numbers and $3,571,305 using the year by year calculation. Both numbers should be adjusted to account for taxes. After that deduction, the total using Mr. Cary's numbers would be $3,272,684. The total using the alternative calculation would be $3,115,964. The total lost pension amount, as provided by Mr. Cary and Mr. Hoffman on a present value basis is $2,636,779. Using these computations, the total past loss would be $5,752,743 (using the alternative calculation) and $5,909,463 using Mr. Cary's past lost salary calculations.

The total present value of the future loss calculation by Mr. Hoffman is $4,744,290 – without applying a deduction for taxes. After deducting a factor for taxes, the future loss is $4,139,393. I recommend an award for past economic loss of $5,752,743 and future economic loss of $4,139,393.

Mr. Hoffman's report includes an amount for future medical expenses based on Mr. Cary's projections. The total amount of projected medical expenses is $14,390,695 for various treatments,

medication, equipment, supplies, care givers, assistants, therapies, diagnostic procedures for a period of 37 years.  Similar to the discussion above, these are potential costs and given the amount of these projected costs, it would be preferable to develop more evidence of their likelihood and need. Accordingly, I recommend deferring any award for future medical costs pending development of a more extensive record.

### F.  Economic Loss Damages: Timothy J. Pope Jr. (Direct Victim)

Plaintiffs submitted a report prepared by Mr. Cary and a report prepared by Mr. Hoffman to support the claim for economic loss damages for Timothy Pope.  According to Mr. Cary's report, Timothy Pope had not worked for 20 years after leaving the military but had recently started work as a plumber.  Mr. Cary reports that although Timothy Pope was discharged from the service at level E-4, based on his qualifications, he would have progressed to level E-7 and pursued a full military career. Thereafter, according to Mr. Cary, he more likely than not would have pursued a post military civilian career. (As noted, this is a common progression among members of the military.)  Mr. Cary thus computes the loss earnings had the military career continued at the E-7 compensation level achieved at 26 years of service and then computes a loss based on a projected civilian salary for an additional 23 years.  The loss based on military service under these assumptions is projected to be $2,950,198. This amount is computed using an annual salary of $113,469 – which as noted – is the compensation amount attained after 26 years of service applied for a period of 26 years.   I computed a year by year loss using the compensation amounts for level E-7 as suggested by Mr. Cary. The total loss from end of service through mid 2024  - a period of 17 years - is $1,640,397. Mr. Cary concludes that Mr. Pope would have embarked on a civilian career at a starting salary of $117,000 based the salary for a GS 12 in North Carolina.  Mr. Cary concludes that Timothy Pope would have continued in this position for 23 years.

Mr. Hoffman computed the future economic loss starting in mid 2024. He computes loss of military wages for approximately 5.5 years and then computes loss in a civilian occupation for an additional 15 years. To compute the losses, Mr. Hoffman relies on the annual compensation levels projected by Mr. Cary and then applies growth rates and benefits consistent with the factors applied in reports discussed earlier. This computation yields a total loss reduced to present value (using the same discount rate) of $4,029,906 before accounting for taxes. After adjusting for taxes, the loss is $3,425,421.

The past loss, using the year by year analysis after adjusting for taxes is $1,431,246. The present value of the lost pension according to Mr. Cary and Mr. Hoffman is $1,524,352. The total past loss using the year by year analysis is therefore $$2,955,598.

Mr. Hoffman includes an amount for future medical expenses for a period of 35 years totaling $14,253,097. As stated with respect to similar medical expense amounts submitted for other plaintiffs, it would be preferable to defer any award for such expenses pending further proof. Many of the items listed are similar to those listed for other plaintiffs.

### G. Economic Loss Damages: Michael S. Anderson (Direct Victim)

Plaintiffs submitted the report of John Cary and the report of Richard Hoffman in support of the claim of economic loss damages for Michael Anderson. Mr. Cary determined that Michael Anderson would have progressed to a level E-8 in the military had he not been injured and would have had a full military career at that level. He computes the annual compensation for an E-8 at $128,006. I prepared a year by year analysis of a level E-8 – and that analysis yields a salary of $118,000 as of 2024 after 15 years of service.

Mr. Hoffman has prepared a summary chart of past and future loss using the $128,000 compensation figure for a period of 15.45 years – yielding a total past loss amount of $1,977,997 before accounting for taxes. The year by year analysis yields a total past loss for compensation of

$1,489,798 before accounting for taxes.  The present value of the pension as calculated by Mr. Hoffman and Mr. Cary is $3,516,802.  Using the compensation value provided by Mr. Cary after deducting taxes and adding the pension, the total past loss would be:  $5,195,100.  Using the year by year analysis, after deducting taxes and adding the pension, the total past loss would be:$4,816,651.

Mr. Hoffman computed the future lost earnings using the compensation level computed by Mr. Cary as $2,660,056 on a present value basis before accounting for taxes. After accounting for taxes, the future lost earning would be:  $2,261,048.

Mr. Hoffman includes an aggregate value for future medical expenses projected to be incurred over the next 40 years.  The total amount estimated is $13,129,386 present value.  As noted above, the projected treatments, medications, equipment, costs of modifications, care givers, and assistance for activities are projected but there is no analysis of existing care resources.  (I note also the complicated lien process that could ensue were medical costs to be covered in an award here.  But as noted earlier, given the extent of these projected services and costs, additional evidence is necessary and this portion of the damages claim should, in my view, be deferred pending further evidence.)

## II.    NON-ECONOMIC PAIN AND SUFFERING DAMAGES – DIRECT VICTIMS

The case law outlines general considerations and ranges of values for victims who have been injured but not killed in terrorist attacks. In general, the cases have identified a "baseline" award that may be increased or decreased based on the severity of the injuries and the ongoing physical and psychological effects. The baseline generally adopted is $5 million for pain and suffering – subject to upward or downward adjustment to account for the circumstances, duration, and severity of injuries. *See Taitt v. Islamic Republic of Iran*, 664 F. Supp. 3d 63 (D.D.C. 2023); *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d, 24, 37-38 (D.D.C. 2012).

"Decisions to deviate from the starting points provided by the *Heiser* framework are committed to the discretion of the particular court in each case ..." *Oveissi v. Islamic Republic of Iran* ("*Oveissi I*"), 768 F. Supp. 2d 16, 26 (D.D.C. 2011).

Awards for pain and suffering are fact specific – with attention to consistency of awards among similarly situated plaintiffs. Variations depend on factors such as the "severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *Winternitz*, 2022 WL 971328, at *10 (quoting *Valore*, 700 F. Supp. 2d at 83-84). In cases where the victim has suffered no or "mild" physical injuries with no lasting physical impact, courts have awarded amounts lower than the $5 million baseline. Courts have awarded enhanced damages based on the severity and need for ongoing treatment for the psychological injury.

Courts have increased awards from the baseline to "$7–$12 million in more severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead." *Valore*, 700 F. Supp. 2d at 84. *See also Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25 (D.D.C. 2007) (awarding $12 million to a victim rendered quadriplegic and $9 million to a victim with severe injuries including skull and face fractures). In *Karcher v Islamic Republic of Iran*, Civ. Act. No. 16-00232 (CKK), 2024 WL 2873712 (D.D.C. June 7, 2024), the court awarded pain and suffering damages for plaintiffs injured by Explosively Formed Penetrators of between $7.75 million and $13.5 million. (One plaintiff was awarded $2.5 million – but the factual differences are not explained.) That case involved injuries caused by EFPs and while those devices are different from the types of explosive device that caused the injuries to the *Swinney* plaintiffs, the values placed on the injuries are instructive. In fact, the injuries experienced by some of the bellwether Direct Victims mirror those associated with the use of EFPs. The matrix developed in *Karcher* includes enhancements of awards based on hospital stays longer than 1year, ongoing psychological injuries, and permanent injuries. Each of these factors resulted in additive

enhancements to the baseline award developed for victims of these devices and those same factors are the types of factors that have supported enhanced pain and suffering damages in other FSIA cases.

### A.  Pain And Suffering Damages: Lance Ashley Gieselmann (Direct Victim)

Plaintiffs request a pain and suffering award of $12 million.  (The expert, Dr. Phelps, recommended $16 million.)  Based on the extensive, devastating, and permanent injuries to Lance Gieselmann, an award of $15 million is reasonable.  Lance Gieselmann has lifelong devastating injuries for which he will forever require ongoing care and treatment.  He spent over a year in the hospital.  He experienced terror and fear while lying on the ground hoping to avoid being shot by the terrorists.  His injuries are some of the most extreme that I have seen in these cases.  I recommend a pain and suffering/non-economic damages award of $15 million.  Dr. Phelps prepared recommended loss awards in Karcher and given his proposal for an award an even higher amount is supportable.

### B.  Pain And Suffering Damages: Richard S. Ford (Direct Victim)

Plaintiffs requested a baseline award of $5 million for Richard Ford.  This amount is certainly reasonable – but given the long term effects of his injuries including tinnitus, the ongoing psychological injuries, and the need for additional surgical treatment, the award could be slightly higher.  I recommend a modest enhancement for an award of $6,500,000.

### C.  Pain And Suffering Damages: Kevin J. Rumley (Direct Victim)

Plaintiffs propose a pain and suffering award of $12 million for Kevin Rumley.  (The expert – Dr. Shean Phelps – recommended an award of $13 million.)  Kevin Rumley sustained extensive devastating injuries.  He underwent 32 surgeries and was hospitalized for one and a half years.  He suffered a traumatic brain injury in addition to physical injuries. He has a permanent partial loss of vision.  When he left the hospital, he became addicted to opioids. He worked hard to overcome that addiction and is currently employed.  Like the injuries suffered by Lance Gieselmann, Kevin Rumley's injuries are extensive, devastating, and in some cases permanent.  The pain of 32 surgeries,

coupled with the long term hospital stay and permanent vision loss support an award far above the 'baseline'.  Accordingly, I recommend an award of $12,750,000 for Kevin Rumley.

### D.  Pain And Suffering Damages: Timothy J. Pope Jr. (Direct Victim)

Plaintiffs requested a pain and suffering award for Timothy Pope of $7 million. An award of $7,750,000 is reasonable based on the facts and consistent with cases involving similar long term injuries including, in particular, multiple traumatic injuries and severe psychological injuries that have resulted in hospitalization.  Accordingly, I recommend a pain and suffering award for Timothy Pope of $7,750,000.

### E. Pain And Suffering Damages: Michael S. Anderson (Direct Victim)

Plaintiffs requested a pain and suffering award of $8 million for Michael Anderson.  An award of $8,750,000 is reasonable based on the facts and consistent with values applied in cases with comparable injuries.  Michael Anderson continues to suffer from the physical injuries received and has documented ongoing psychological injuries.  He requires long term treatment and surgeries.  He has been diagnosed with depressive disorder.  He has permanent hearing loss and experiences tinnitus.  I recommend an award of $8,750,000 as reasonable and consistent with precedent.

## III.    NON ECONOMIC/SOLATIUM AWARDS FOR FAMILY MEMBERS OF VICTIMS

### A.  OVERVIEW: LEGAL BASIS FOR SOLATIUM DAMAGES FOR FAMILY MEMBERS OF VICTIMS

Section 1605A(c) expressly provides for solatium damages to immediate family members of victims. Solatium damages provide compensation for mental anguish, grief, and loss of society and comfort. *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 85 (D.D.C. 2010) ("Under the FSIA, a solatium claim is indistinguishable from an IIED claim. Solatium is awarded to compensate the the [*sic*] mental anguish, bereavement, and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent's society and comfort.") (internal citations, quotation marks,

and alterations omitted)).

The immediate family is defined as the victim's spouse, parents, siblings, and children. *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 28 (D.D.C. 2009) ("*Heiser II*") (citing *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 36 n.8 (D.D.C. 2001), *aff'd sub nom. Bettis v. Islamic Republic of Iran*, 315 F.3d 325 (D.C. Cir. 2003)).

In general, there is a presumption that immediate family members suffer grief and emotional injury as a result of a terrorist attack on another family member. *See Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 38 (D.D.C. 2016) ("The guidelines emerging from prior decisions begin with the 'presumption' that family members in direct lineal relationship 'suffer compensable mental anguish and testimony proving a close relationship will usually be sufficient to sustain an award of solatium damages.'") (quoting *Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 290 (D.D.C. 2015)) (internal alterations omitted); *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 403 (D.D.C. 2015) ("Courts may presume that those in direct lineal relationships with victims of terrorism suffer compensable mental anguish. As for siblings, testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages.") (citations omitted).

Terrorist attacks are expressly intended to cause fear and anguish among the public in general and family members in particular. *See Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d. 105, 115 (D.D.C. 2005) (a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families). Accordingly, immediate family members need not be present at the attack to be eligible for solatium damages. *See Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 84 (D.D.C. 2017) ("*Cohen I*") ("Solatium claims are typically brought by family members who were not present or injured themselves"); *see*, *id*. at 85 ("[B]ecause of the appalling and extreme nature of terrorist attacks, courts in this district have generally held that a defendant is

liable to the victim's family even if they were not physically present during the attack as long as there is some evidence of that they suffered mental anguish and trauma as a result of it") (citing *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 81-83 (D.D.C. 2017); *Ben–Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 56–57 (D.D.C. 2008)).

An immediate family member who provides credible testimony about the effect on him or her of the attack is eligible for an award of solatium damages – provided that the relationship is sufficiently close. *See Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 72-73 (D.D.C. 2015) (declaration that victim's detention and torture caused claimant significant "mental anguish" supported awarding solatium damages consistent with framework of *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006) ("*Heiser I*")).

## B. SOLATIUM DAMAGES FOR FUNCTIONAL EQUIVALAENTS OF IMMEDIATE FAMILY MEMBERS

Courts have determined that the immediate family includes immediate family members of half-blood. *See Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 52 (D.D.C. 2007) ("*Peterson II*") ("[s]iblings of half-blood to the servicemen in this case are presumed to recover as a full-blood sibling would[.]").

The immediate family also includes stepparents, stepchildren as well as others who are the "functional equivalent" of an immediate family member to the extent that these individuals demonstrate a sufficiently close relationship to the victim. *See, e.g., Fritz v. Islamic Rep. of Iran,* 324 F. Supp. 3d 54, 62-63 ("*Fritz I*") (awarding solatium damages to a stepmother and a stepbrother based on evidence that the relationships were the functional equivalent of a parent or sibling); *Cabrera v. Islamic Republic of Iran*, No. CV 18-2065 (JDB), 2024 WL 4345784, at *5 (D.D.C. Sept. 30, 2024) (immediate family members "includes members of the victim's household who are viewed as the functional equivalents of immediate family members," even if they are not

legally or biologically related); *Valore*, 700 F.Supp.2d at 79-80 (awarding solatium damages to plaintiffs who, to extent considered stepfather or stepbrother, respectively considered and treated victim as own son or brother and were functional equivalents of a father and brother). *See also Bettis*, 315 F.3d at 337 ("recently, the District Court allowed recovery for intentional infliction of emotional distress to a woman who, although not legally married to the victim, had lived with him for over 20 years in a 'bond that was the functional equivalent of marriage.'") (citation omitted).

In sum, the parents, spouses, siblings, and children, including step relations and those who function in such roles even if not biologically related or related by adoption of victims of terrorist attacks are entitled to an award of solatium damages provided that the evidence confirms the nature of the relationship.

## C.    DETERMINING AWARDS FOR YOUNG CHILDREN

Courts have addressed the question of appropriate awards to children who were very young at the time of their parent's death from a terrorist attack. Courts have not adopted a firm definition of a "very young" child – but the issue arises in cases involving a child (typically younger than 3) – who likely would be too young to remember the parent who was killed in the terror attack. Some decisions have reduced the compensation amount from the baseline when considering solatium damages for a very young child, concluding that such a child would not recall their life with the deceased parent and so would not consciously suffer a loss comparable to the loss experienced by an adult or older child. *See, e.g. Cabrera v. Islamic Republic of Iran*, No. CV 18-2065 (JDB), 2024 WL 3225942, at *11 (D.D.C. June 28, 2024) ("The Court previously applied downward variances of 40% for children under the age of 1 and 30% for children between the ages of 1–3… and continued to apply those variances absent a showing that a particular plaintiff's relationship with the victim-parent was either stronger or weaker than expected.); *Akins v. Islamic Republic of Iran,* 332 F.Supp.3d 1, 43 (2018)

(applying downward departure to plaintiff who was an infant at the time of the attack).  Other courts have considered the totality of circumstances and the traumatic effect on a child growing up without a parent and in a household that has been affected by and continues to experience and exhibits grief and loss.  *See, e.g. Ben-Rafael*, 540 F. Supp. 2d at 57-58 (awarding $5 million in solatium damages to each child of a slain father, who were three years old and nine months old at the time of his murder, because of sense of loss of father figure and difficulty enjoying life).

Solatium damages are intended to address all types of loss resulting from the death of a family member including loss of guidance and companionship.  Courts have recognized that these losses and the effect of the loss of a family member extends over multiple years and can affect the survivors for a lifetime.  Children growing up in a household that has been so affected by the loss of a close family member experience emotional injury and suffering – regardless of the age of the child at the time of the family member's death.  *Id.*; *Lee v. Islamic Republic of Iran*, No. 19-CV-00830 (APM), 2023 WL 8651039, at *4-5 (D.D.C. Dec. 7, 2023) *(*awarding $5 million to daughter who was two years old: "Ms. Vacho was only two years old when her father died. Growing up with a deceased parent was an emotionally and socially isolating experience. She missed SSG Vacho greatly on numerous milestones—when she was a cheerleader at football games, when she received her driver's license, and when she became an adult. Ms. Vacho keeps mementos from her father, including a letter from him, his old hunting rifle, and his high school letterman jacket. Ms. Vacho finds the anniversary of her father's death particularly challenging, and she feels as though nothing can compensate for the loss of her father. Although Ms. Vacho was very young when SSG Vacho was killed, she is still entitled to baseline damages awards for children.); *see also Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40, 75 (D.D.C. 2021) (awarding a 25 percent upward departure to a plaintiff who was a minor at the time of his father's killing "because courts have recognized the particularly devastating effect that the loss of a parent can have on minors") (citing *Oveissi I*, 768 F. Supp. 2d at 29); *Jakubowicz v. Islamic*

*Republic of Iran*, No. CV 18-1450 (RDM), 2023 WL 6907852, at *7 (D.D.C. Sept. 1, 2023) ("*Jakubowicz II*") (awarding minor child a 25 percent enhancement based on a loss of parental guidance during formative years); *Mark v. Islamic Republic of Iran*, 626 F. Supp. 3d 16, 38 (D.D.C. 2022) (awarding enhancement because child "lost an irreplaceable provider, guide, and nurturer at a critical point in her young life"); *Schooley v. Islamic Republic of Iran*, No. CV 17-1376 (BAH), 2019 WL 2717888, *79 (D.D.C. June 27, 2019) (applying baseline award to young children in the context of injured victims; and stating:. "Some of the children were too young at the time of the attack to fully comprehend that their parents had been injured, …whereas other children were old enough to understand and experience the horror of the attack. Differences in children's relative levels of awareness at the time do not alter the losses they experience from growing up with injured parents, and the strain that those injuries put on their families. In fact, the children who were too young to experience their parent's injury at the time necessarily also had fewer, if any, years with their parents before their parents were injured.  Thus, consistent with the *Heiser* framework, the children of the injured service members are each entitled to an award of $1,500,000.").

Accordingly, in determining the amount of a solatium award for a young child, it is necessary to assess all factors, including the long-term effect on the child and on the family as a whole of the loss of a parent.   These factors must be assessed on a case-by-case basis, taking into account the evidence submitted.

## C.  GUIDELINES FOR VALUING SOLATIUM DAMAGES

Of course, compensatory damages cannot make up for the permanent loss of a family member or the devastation to family life caused by traumatic injuries to a family member. The courts in  this Circuit have developed guidance outlining the considerations to be applied in determining the appropriate amount of solatium damages for family members of victims of terrorist attacks.  These

guidelines, and the dollar amounts applied in numerous decisions, help to foster equality of treatment among similarly situated victims of terrorism. *See Cabrera v. Islamic Republic of Iran*, No. 19-3835 (JDB), 2022 WL 2817730, at *48 (D.D.C. Jul. 19, 2022) ("*Cabrera I*") (emphasizing the importance of providing similar solatium awards to similarly situated plaintiffs). Courts have generally applied values set forth in *Heiser I*, and *Peterson II*, to set a framework for analysis. That framework and pertinent case law provide a baseline for solatium damages for family members of victims killed in a terrorist attack of $8 to $12 million for spouses, $5 million for parents and children, and $2.5 million for siblings. *See generally*, *id*. at*47 (citing *Peterson II*); *W.A. v. Islamic Republic of Iran*, No. 18-CV-1883(CKK/GMH), 2020 WL 7869218, at *16 (D.D.C. Mar. 23, 2020), report and recommendation adopted, No. CV 18-1883 (CKK), 2020 WL 7869211 (D.D.C. Apr. 11, 2020) ("*W.A. II*") (awarding $12 million in solatium damages to a spouse experiencing *inter alia* "acute feelings of permanent loss").

These amounts are guideposts – and they are neither mandatory nor applicable in all cases. *See Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 361-62 (D.C. Cir. 2018); *Murphy*, 740 F. Supp. 2d at 79. The award should be determined with reference to the baseline framework values (which helps to assure consistency of outcome) taking into consideration the particular facts of each case.

Courts have awarded both upward and downward adjustments from the baseline values. *See, e.g.*, *Estate of Brown v. Islamic Republic of Iran*, 872 F. Supp. 2d 37, 44 (D.D.C. 2012) (departing downward for a mother who had lost contact with her victim son for the sixteen years preceding his death). Conversely, courts typically have awarded higher amounts where the evidence shows more extreme or significant short and long-term effects on the family member. As expressed by the court in *Oveissi v. Islamic Republic of Iran*, the solatium award is determined based on multiple factors, including "evidence establishing an especially close relationship

between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing." 768 F. Supp. 2d 16, 26-27 (D.D.C. 2011) ("*Oveissi I*"). Examples include cases where a family member is under medical care for depression or other emotional injury, or where the testimony makes clear that the family member continues to experience and feel the loss and change. *See, e.g., id.* at 30 (awarding a 50 percent enhancement due to the family member's lifelong emotional trauma including depression, anger, and alcoholism following the victim's death); *Valore*, 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders"); *Bernhardt*, 2023 WL 2598677, at *16 (awarding a 25 percent enhancement to baseline solatium damages to family members for their severe mental distress from the victim's sudden death). In the most extreme cases, upward departures may exceed 40 percent. *See, e.g.*, *Oveissi I*, 768 F. Supp. 2d at 30 (awarding a 50 percent enhancement); *W.A. II*, 2020 WL 7869218, at *16 (awarding a 50% enhancement for pain and suffering for a surviving family member who experienced acute feelings of permanent loss or change caused by the decedent's absence).

### G.   RECOMMENDED SOLATIUM AWARDS

Initially, as stated above, each of the family member plaintiffs seeking solatium awards has established standing and the necessary familial relationship that provides the legal basis for a solatium award. The recommended compensation amounts set forth below are based on each plaintiff's testimony, nature of the relationship between the family member and the victim and pertinent case law.

1.  **Spears Family.**

The Spears family not only suffered the devastating loss of their son and brother Corporal Jonathan Spears also the loss of their wife and mother.  The record shows that Marie Spears – Jonathan's mother – was so consumed with grief that she took her own life.  This unimaginable double loss – coupled with the testimony of the family members showing long term emotional and psychological injuries – supports enhanced awards for each of the surviving family members.

a.  **Timothy Lawrence Spears (Parent)**

Plaintiffs request a solatium award of $7,500,000.00 for Timothy Spears.   The Peterson/Heiser value for the claim of a parent is $5 million.   In this case, however, the circumstances support a significant enhancement and, accordingly, I recommend an award of $9.0 million.  *See, e.g. Oveissi I.*

b.  **Jessica Woolen  and Jennifer Glodfelter (Siblings)**

Plaintiffs request a solatium award of $3,750,000.00 for each of Corporal Spears' siblings.  The Peterson/Heiser value for the claim of a sibling is $2.5 million.  Given the circumstances as noted, I recommend an enhancement for the solatium claims of both siblings – for a total award of $4.5 million each.

2.  **Varnado Family.**

a.  **Sharon Shavers-Varnado (widow)**

Plaintiffs request a solatium award of $10 million for Sharon Shavers-Varnado – the spouse of Direct Victim Sergeant Varnado.  This amount is within the range of values accepted by courts in FSIA cases although many courts have indicated that $ 8 million is a more appropriate award amount.  The testimony of Sharon Shavers-Varnado supports a higher amount.  She was very young when she lost her husband and the testimony shows that she was 'lost' and without direction. Their

carefully developed plan for their education at the conclusion of Sergeant Varnado's service was destroyed.  The testimony demonstrates the Sharon Shavers-Varnado experienced long term psychological effects from her loss.  Accordingly, I recommend an award of $11.5 million.

### b. Kannon Joshua Varnado (child)

Kannon Varnado was only 15 months old when his father was killed. The testimony makes clear that he did not know his father.  His knowledge of his father is based on what others have told him over the years.  As noted, many courts have adopted substantially reduced award amounts whether the child either did not know or was too young to remember the parent who was lost.  However, as other courts have recognized, a child who grows up in a household that has experienced such a devastating loss can be profoundly affected.  Kannon provided deposition testimony demonstrating grief and loss he felt as he grew older and understood what had happened to his father. Given his young age at the time, his clear success as a young adult, the fact that he did end up in a family environment, I recommend a solatium award of $5 million for Kannon Varnado.

## IV.    ECONOMIC LOSS FOR FAMILY MEMBERS OF DIRECT VICTIMS

Plaintiffs seek economic loss damages for each of the family member plaintiffs. In some cases, courts have awarded economic loss damages for family members of victims – for example where the evidence shows that the family member is unable to work due to extreme psychological injuries.  *See e.g., Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012) (court awarded $2,035,000 in economic damages to account for the plaintiff's diminished earning capacity as a result of his emotional distress, his chronic depression and the self-destructive behavior that was triggered by his father's kidnapping and subsequent trauma.)

### 1.  Spears Family - Economic Loss

a. **Timothy Spears.**  Plaintiffs submitted a report indicating a loss totaling $796,336

computed for an 8 year period. (The report states that this period is 2018 to 2007. This appears to be a typo – I believe that the report meant to say 2018 to 2027.) Exhibit P 0340-00030. It appears from the report that Mr. Spears left the work force in 2018 before full retirement age in large part due to a medical diagnosis of polymyositis. Exhibit P0340 – 00019. Mr. Cary reports that Dr. Phelps stated that it is more probably than not that Mr. Spears' polymyositis (an autoimmune disease) was related to his probable PTSD. Exhibit P0340 – 00027. This statement is not based on a personal examination of Timothy Spears and appears to be based on studies that have found an increased risk of certain autoimmune conditions in individuals with a history of PTSD. Mr. Spears worked for 13 years after the death of his son and while his situation is extremely sympathetic, it does not appear that the statement of Dr. Phelps under these circumstances provides a sufficient basis to conclude that Timothy Spears was unable to continue working because of the death of his son. Accordingly, I do not recommend economic loss for Timothy Spears.

> b. **Jessica Spears and Jennifer Glodfelter**

Mr. Cary analyzed the loss of earning capacity for both of Corporal Spears' sisters. He determined that their psychological injuries which have affected their ability to attain a higher educational level affects their lifetime earnings capacity. The record shows that both of these plaintiffs have had difficulty completing their Bachelors degrees and are employed at jobs that are compensated at a level lower than the median income for individuals with Bachelors degrees in the United States. Mr. Hoffman has computed the economic loss – past and future – for both under two scenarios. The first scenario assumes that they will continue working in somewhat lower paying jobs. The second scenario assumes that their psychological injuries will prevents them from working full time or consistently. The first scenario is consistent with the record and therefore is more appropriate. Under this scenario, Mr. Hoffman calculates a

total compensation loss of $1,652,032 for Jennifer and $1,700,674 for Jessica without accounting for taxes. If a factor for tax is applied, the amount for Jennifer would be: $1,404,228 and after application of taxes the amount for Jessica would be $1,445,573.

The basis for this approach is reasonable given the testimony and analysis conducted by Mr. Cary. In light of the extreme circumstances faced by this family, I recommend granting economic loss for these two plaintiffs in the amounts stated above.

Mr. Hoffman includes a projected amount for future medical expenses for each of these plaintiffs. These expenses are computed through 2076 for Jennifer and 2074 for Jessica. The list of costs includes many of the same items included in the medical cost charts for other plaintiffs. At this time, these costs are too speculative and I recommend no award for medical costs.

**2. Varnado Family – Economic Loss**

Based on the record, there is no basis to award economic loss for Sharon Shavers. Sharon Shavers testified that she has continued to work in the field of cosmetology – for which she initially trained before the death of Daniel Varnado. The economic loss computation is based on the conclusion that some cosmetologists earn higher amounts then Sharon has been earning. There could be many reasons for this – including geographic reasons. Accordingly, I do not recommend an award for economic loss for Sharon Shavers.

The expert has provided a revised analysis regarding economic loss for Kannon Varnado. Mr. Cary has opined that someone who has suffered the type of loss Kannon has experienced can experience a reduction in future income because of the long-term psychological effects of such a significant loss. The original analysis assumed that Kannon would have achieved earning in the 90th percentile for his entire work life but for the loss of his father and that the loss would result in a diminution of those earnings throughout his worklife. Mr. Hoffman has provided a revised analysis

that starts with the average salary for college graduates. (Kannon has completed 2 years of college.) Mr. Hoffman then increases that salary throughout worklife using appropriate values (similar to those used in the loss calculations for other plaintiffs in this case), adjusted the amounts to account for taxes, and then discounted the computed amounts to present value. He then accounts for a diminution in those earnings due to the effects on Kannon of the loss of his father. He applies a 17% diminution factor – which is the percentage that Mr. Cary had opined would account for the effect of the loss on Kannon's future career earnings. The total economic loss using this methodology is $261,000.

## V.    PREJUDGMENT INTEREST

The plaintiffs requested an award of prejudgment interest in their complaint.

The decision to award prejudgment interest, as well as how to compute that interest, "rests within the discretion of the court, subject to equitable considerations.'" *Fritz I*, 324 F. Supp. 3d at 63 (*quoting Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011)). Courts have differed regarding the propriety of pre-judgment interest in FSIA cases and courts have also differed as to the rationale for such awards and the types of damages to which such awards should apply. *See, e.g.*, *Gunn v. Islamic Republic of Iran*, No. 21-1187, 2024 WL 3566173, at *35 (D.D.C. July 29, 2024) ("[c]ourts in this Circuit have split on whether an award of prejudgment interest on compensatory damages is appropriate in FSIA suits.") (quoting *Barry*, 437 F. Supp. 3d at 60); *see also Doe A-1 v. Democratic People's Republic of Korea*, No. 18-CV-0252 (DLF), 2021 WL 723257, at *9 (D.D.C. Feb. 24, 2021) ("Courts in this district have taken varying approaches to requests for prejudgment interest").

Prejudgment interest has generally been justified as a means of accounting for the delay in payment resulting from the litigation. "Where courts have made such an award, they have generally justified it based on a delay between the time of the attack giving rise to the injury and the time at which

the claimants received relief." *Barry II*, 437 F. Supp. 3d at 60 (citing *Reed*, 845 F. Supp. 2d at 214)

(citing *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530 F. Supp. 2d  216, 263-65; *Baker*, 775

F. Supp. at 86).  "'The purpose of such awards is to compensate the plaintiff for any delay in payment

resulting from the litigation.'" *Fritz I*, 324 F. Supp. 3d at 63 (*quoting Oldham v. Korean Air Lines Co*.,

127 F.3d 43, 54 (D.C. Cir. 1997)).  Further, "[f]ailure to award prejudgment interest 'would also allow

the Iranian defendants to 'profit from the use of the money' in the intervening time." *Cabrera I*, 2022

WL 2817730, at *55 (quoting *Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236, 250 (D.D.C.

2020)).  "Accordingly, '[p]rejudgment interest is an element of complete compensation.'" *Fritz I*, 324

F. Supp. 3d at 63 (*quoting Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 59 (D.D.C. 2012)

("*Oveissi II*") (*quoting West v. United States*, 479 U.S. 305, 311-12, 107 S. Ct. 702, 93 L.Ed.2d 639

(1987)).  *See also Jakubowicz v. Islamic Republic of Iran,* No. 18-1450, 2024 WL 1826610, at *3

(D.D.C. Apr. 25, 2024) (finding no reason to revisit court's prior conclusion that ""prejudgment interest

was appropriate on both 'past economic loss' and on the 'non-economic pain and suffering and solatium

damages suffered by the victims' estates and families.'") (quoting *Force v. Islamic Republic of Iran,*

617 F. Supp. 3d 20, 42 (quoting *Fritz I*, 324 F. Supp. 3d at 64)); *Schwartz v. Islamic Republic of Iran,*

No. 18-cv-1349, 2022 WL 1567358, at *5 (D.D.C. May 18, 2022) (awarding plaintiffs prejudgment

interest on the solatium damages awarded to the families of the three victims); *Kinyua v. Republic of*

*the Sudan,* 466 F. Supp. 3d 1, 12 (D.D.C. 2020) ("'A solatium award is therefore best viewed as fixed

at the time of the loss,' … and plaintiffs are entitled to the full amount of their award as if they received

it in 1998. Failing to do so would not only place the present plaintiffs at a disadvantage relative to their

family members in earlier litigation but would also allow the Iranian defendants 'to profit from the use

of the money over the past [two] decades.'") (quoting *Fritz I*, 324 F. Supp. 3d at 64 and *Estate of Doe*

*v. Islamic Republic of Iran*, 943 F. Supp. 2d 180, 184 n.1 (D.D.C. 2013)); *Wamai*, 60 F. Supp. 3d at 98

(Bates, J.) (stating, in action brought by victims of embassy bombings, that "[p]rejudgment interest is

appropriate on the whole award, including pain and suffering and solatium" and past economic loss, but not on present economic loss); *see also Fritz I*, 324 F. Supp. 3d. at 64 (Moss, J.) (awarding prejudgment interest on the past economic loss of the direct victims abducted and murdered in Iraq as well as the non-economic pain and suffering and solatium damages suffered by the victims' estates and families); *Fritz v. Islamic Republic of Iran*, 466 F. Supp. 3d 13 (D.D.C. 2020) ("*Fritz II*") (Moss, J.) (finding additional family member entitled to damages and following *Fritz I* in awarding prejudgment interest); *Belkin*, 667 F. Supp. 2d at 24 (Friedman, J.) (awarding prejudgment interest in action arising from suicide bombing in Israel). [12]

Conversely, other courts in this Circuit have concluded that prejudgment interest is not appropriate because the "values set by" the general damages framework that courts have applied "represent the appropriate level of compensation, regardless of the timing of the attack … These courts emphasize that 'pain and suffering and solatium damages are both designed to be fully compensatory.'" *Barry II*, 437 F. Supp. 3d at 60 (citing *Oveissi I*, 768 F. Supp. 2d at 30 n.12; *Wyatt*, 908 F. Supp. 2d 216, 232 (D.D.C. 2012)); *see also Estate of Fouty v. Syrian Arab Republic*, No. 18-385, 2024 WL 4006166 at *26 (D.D.C. Aug. 20, 2024) ("'the majority of Judges on this Court [who have] consider[ed] the issue of prejudgment interest for [Foreign Sovereign Immunities Act] damages awards have held 'the values set by the *Heiser* framework represent the appropriate level of compensation, regardless of the timing of the attack,' and that 'pain and suffering and solatium damages are both designed to be

---

[12]  *See also Cabrera,* 2024 WL 4345784, at *6 (following *Cabrera I* and finding prejudgment interest was appropriate); *Sheikh*, 485 F. Supp. 3d at 274 ("'plaintiffs are entitled to the full amount of their award as if they received it at the time of the injury,' and failure to award prejudgment interest would 'allow the Iranian defendants to profit from the use of the money over the last [two] decades.'") (quoting *Ewan*, 466 F. Supp. 3d at 250 (addressing embassy bombing claims)); *Christie v. Islamic Republic of Iran*, No. 19-1289 (BAH) 2020 WL 3606273, at *19-20 (D.D.C. July 2, 2020) (stating, in action arising out of 1996 bombing of Khobar Towers, that "[f]ailing to award prejudgment interest would place plaintiffs at a disadvantage relative to plaintiffs in earlier litigation"); *Opati v. Republic of Sudan*, 60 F. Supp. 3d 68, 82-83, n.10-12 (D.D.C. 2014) (Bates, J.) (awarding prejudgment interest to victims of embassy bombings).

fully compensatory'") (quoting *Blank v. Islamic Republic of Iran*, No. 19-cv-3645, 2021 WL 3021450, at *14 (D.D.C. July 17, 2021) (internal citations and quotation marks omitted); *Shourd v. Government of Islamic Republic of Iran,* Case No. 22-cv-1309, Case No. 22-cv-2110, Case No. 22-cv-2294, 2024 WL 4346330, at *9  (D.D.C. Sept. 30, 2024) (finding that "prejudgment interest only applies to the economic loss awards, and not pain and suffering, solatium, or punitive damages"); *Schertzman Cohen v Islamic Rep. of Iran*, No. 17-1214 (JEB) 2019 WL 3037868, at *10 (D.D.C. July 11, 2019); *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d at 43; *Thuneibat*, 167 F. Supp. 3d 22, 54; *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 45–46 (D.D.C. 2018) ("*Akins I"*); *Akins v. Islamic Republic of Iran*, 549 F. Supp. 3d 104, 121-22 (D.D.C. 2021) ("*Akins II*"), (denying motion to, *inter alia,* add prejudgment interest to baseline awards finding that the "majority of Judges confronted with this issue have concluded—as this Court did in *Akins*—that 'pain and suffering and solatium damages are both designed to be fully compensatory.'") (quoting *Barry II*, 437 F. Supp. 3d at 60).

The amount of prejudgment interest can be evaluated separately for each component of damages based on whether the recommended damages can be viewed as fully compensatory without prejudgment interest.[13]

- **Past Economic Loss.** Past economic loss is defined as the loss that existed as of the date of the abduction of the victim up until the date on which the economic loss was computed by the expert. Past economic loss is expressed as a nominal dollar amount and is not reduced to present value.  Accordingly, it would be appropriate to apply prejudgment interest to the past loss (which is not adjusted by any interest factor) in the economic loss report.

- **Future Economic Loss**:  Future economic loss is expressed in terms of a present value – and the discount factor is applied to each year of loss back to the date of the economic loss

---

[13]  *See Sotloff v. Syrian Arab Republic*, No. 16-CV-725 (TJK), 2022 WL 22902285, at *24-25 (D.D.C. May 20, 2022) (report and recommendation), *report and recommendation adopted*, No. CV 16-725 (TJK), 2023 WL 2727599 (D.D.C. Mar. 31, 2023)

computation.  Application of prejudgment interest at a different rate would alter the present value computation and create an inconsistent loss calculation.  Accordingly, it is not appropriate to apply prejudgment interest to future economic loss.

- **Pain and Suffering Damages for the Direct Victims and Solatium Damages.**  Pain and suffering damages for the injured Direct Victims and solatium damages for their family members present a somewhat more complex issue. Pain and suffering may include an ongoing component, and solatium damages are intended to compensate for grief and loss – not limited in time.  The recommended amount of solatium damages accounts for the permanence of the loss and the ongoing grief.  In that sense, the rationale for prejudgment interest as a necessary factor to make the plaintiff whole and bring the loss value to the present time does not inevitably apply. For this reason, some courts have found that pain and suffering and solatium damages are by their nature fully compensatory and thus an award of prejudgment interest is not necessary to fully compensate the plaintiffs.  *See Winternitz*, 2022 WL 971328, at *12.[14]  As noted above, other courts have concluded that prejudgment interest is appropriate in such cases.[15]

For the Court's consideration, I have provided a calculation of prejudgment interest from the date of the relevant attack through May 2025 at the applicable federal prime rate for the Direct Victim's pain and suffering damages and past economic loss damages.  I have also included for the Court's

---

[14] *See also Gration v. Islamic Republic of Iran*, No. 21-CV-1859 (BAH), 2023 WL 5221955, at *37 (D.D.C. Aug. 15, 2023) ("[D]amages for pain and suffering and solatium 'do not typically require prejudgment interest because they are designed to be fully compensatory.'") (internal quotations omitted) (quoting *Thuneibat*, 167 F. Supp. 3d at 54); *Ackley v. Islamic Republic of Iran*, No. 20-CV-621 (BAH), 2022 WL 3354720 (D.D.C. Aug. 12, 2022) (same).

[15] *See, e.g., Ewan*, 466 F. Supp. 3d at 250 (concluding "that an award of prejudgment interest here is appropriate" because "plaintiffs are entitled to the full amount of their award as if they received it at the time of the injury," and the "[f]ailure to do so would also allow the … defendants to profit from the use of the money" in the intervening years) (quoting *Doe*, 943 F. Supp. 2d at 184 n.1).

consideration a computation of prejudgment interest on the recommended solatium damages.

Prejudgment interest is calculated at the prime rate for each year from the date of the respective attack using the methodology described in *Fritz I*, 324 F. Supp. 3d at 64, 67 n. 2. *See also Jakubowicz*, 2024 WL 1826610, at *3; *Ewan*, 466 F. Supp. 3d at 250 n.3.2 [16] A multiplier was calculated using the Federal Reserve's data for the average annual prime rate from the bombing through May 2025. *See* Bd. of Governors of the Fed. Reserve Sys., Historical Data, available at https://www.federalreserve.gov/datadownload/Choose.aspx?rel=H15 (last accessed May 21, 2025). [17]

I multiplied $1.00 by the prime rate in the year of the relevant attack and then multiplied the resulting product by the percentage of the days of the year remaining as of the date of the attack.  I

---

[16] For 2025, I applied the current prime rate through May, 2025, and not a discounted six-year average that had been described in *Ewan*.

[17]  The rates applied are as follows:

| | |
|---|---|
| 2003 | 4.12 |
| 2004 | 4.34 |
| 2005 | 6.19 |
| 2006 | 7.96 |
| 2007 | 8.05 |
| 2008 | 5.09 |
| 2009 | 3.25 |
| 2010 | 3.25 |
| 2011 | 3.25 |
| 2012 | 3.25 |
| 2013 | 3.25 |
| 2014 | 3.25 |
| 2015 | 3.26 |
| 2016 | 3.51 |
| 2017 | 4.10 |
| 2018 | 4.91 |
| 2019 | 5.28 |
| 2020 | 3.54 |
| 2021 | 3.25 |
| 2022 | 4.86 |
| 2023 | 8.20 |
| 2024 | 8.31 |
| 2025 | 7.50 (current rate) (applied though May 31) |

then added that product to $1.00.  Next, I multiplied that amount by the prime rate the following year and added that amount.  I continued this iterative process through May of 2025 calculating interest for 2025 on the days through May 31 and applying the current interest rate for 2025, The calculation yields respective multipliers as detailed in the charts at the end of this Report. As the Court explained in *Wamai* and *Opati*, "[t]he product of the multiplier and the base damages amount includes both the prejudgment interest and the base damages amount; in other words, applying the multiplier calculates not the prejudgment interest but the base damages amount plus the prejudgment interest, or the total compensatory damages award."  *Wamai*, 60 F. Supp. 3d at 99 n. 16; *Opati*, 60 F. Supp. 3d at 83 n. 12.

VI.    **SUMMARY CHARTS**

| DIRECT VICTIM | SECTION 1 - PAIN AND SUFFERING | | | SECTION 2A - PAST ECONOMIC LOSS (EXCLUDNG PENSION LOSS) | | | Section 2B - PAST PENSION LOSS | SECTION 2C - FUTURE ECONOMIC LOSS | TOTALS | | Multiplier |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | PAIN AND SUFFERING | PREJUDGMENT INTEREST ON PAIN AND SUFFERING | PAIN AND SUFFERING WITH PREJUDGMENT INTEREST | PAST ECONOMIC LOSS (excluding pension) | PREJUDGMENT INTEREST ON PAST ECONOMIC LOSS (excluding pension) | PAST ECONOMIC LOSS (excluding pension) WITH PREJUDGMENT INTEREST | Past Pension Loss | FUTURE ECONOMIC LOSS (No Prejudgment Interest) | TOTAL WITHOUT PREJUDGMENT INTEREST | TOTAL WITH PREJUDGMENT INTEREST ON PAIN AND SUFFERING AND PAST ECONOMIC LOSS | |
| Michael S. Anderson | $8,750,000 | $11,127,673 | $19,877,673 | $1,299,849 | $1,653,062 | $2,952,911 | $3,516,802 | $2,261,048 | $15,827,699 | $28,608,434 | 2.27 |
| Richard S. Ford | $6,500,000 | $10,471,639 | $16,971,639 | $1,464,956 | $2,360,075 | $3,825,031 | $1,442,360 | $315,800 | $9,723,116 | $22,554,830 | 2.61 |
| Lance A. Gieselmann | $15,000,000 | $26,385,027 | $41,385,027 | $1,247,927 | $2,195,105 | $3,443,032 | $1,030,393 | $966,813 | $18,245,133 | $46,825,265 | 2.76 |
| Timothy J. Pope Jr | $7,750,000 | $12,417,180 | $20,167,180 | $1,431,246 | $2,293,167 | $3,724,413 | $1,524,352 | $3,425,421 | $14,131,019 | $28,841,367 | 2.60 |
| Kevin J. Rumley | $12,750,000 | $21,784,932 | $34,534,932 | $3,115,964 | $5,324,005 | $8,439,968 | $2,636,779 | $4,139,393 | $22,642,136 | $49,751,073 | 2.71 |
| Jonathan Spears | $0 | $0 | $0 | $2,074,760 | $3,114,575 | $5,189,335 | $5,945,705 | $2,039,333 | $10,059,798 | $13,174,373 | 2.50 |
| Daniel Varnado | $0 | $0 | $0 | $1,253,277 | $1,961,781 | $3,215,057 | $1,912,045 | $1,357,478 | $4,522,800 | $6,484,580 | 2.57 |

| FAMILY MEMBERS | Relationship to Direct Victim | SOLATIUM DAMAGES | PREJUDGMENT INTEREST ON SOLATIUM DAMAGES | SOLATIUM WITH PREJUDGMENT INTEREST | ECONOMIC LOSS | TOTAL WITHOUT PREJUDGMENT INTEREST | TOTAL WITH PREJUDGMENT INTEREST | Multiplier |
|---|---|---|---|---|---|---|---|---|
| Timothy Spears | Parent | $9,000,000 | $13,510,564 | $22,510,564 | $0 | $9,000,000 | $22,510,564 | 2.50 |
| Jessica Wollen | Sibling | $4,500,000 | $6,755,282 | $11,255,282 | $1,445,573 | $5,945,573 | $12,700,855 | 2.50 |
| Jennifer Glodfelter | Sibling | $4,500,000 | $6,755,282 | $11,255,282 | $1,404,228 | $5,904,228 | $12,659,510 | 2.50 |
| Sharon Shavers | Spouse | $11,500,000 | $18,001,197 | $29,501,197 | $0 | $11,500,000 | $29,501,197 | 2.57 |
| Kannon Varnado | Child | $5,000,000 | $7,826,607 | $12,826,607 | $261,000 | $5,261,000 | $13,087,607 | 2.57 |

Dated: May 30, 2025                           Respectfully submitted,

                                              By: */s/ Deborah E. Greenspan*
                                                  Deborah E. Greenspan, Esq.
                                                  Special Master